INMATES, D. C. JAIL, et al., Plaintiffs,

v.

Delbert C. JACKSON et al., Defendants.

Civ. A. No. 75–1668.

United States District Court,
District of Columbia.

May 24, 1976.

Nancy Crisman, National Prison Project,
Washington, D. C., for plaintiffs.

Thomas R. Nedrich, Asst. Corp. Counsel,
Washington, D. C., for defendants.

MEMORANDUM AND ORDER

BRYANT, District Judge.

This matter is now before the Court on
plaintiffs' Motion For Partial Summary

Judgment and defendants' opposition thereto. In this class action suit, plaintiffs, who comprise a class consisting of all post-trial detainees at the D. C. Jail, seek to have the Court declare unconstitutional various conditions at the Jail and order defendants to remedy the deficiencies found.

This case is substantially identical to *Campbell v. McGruder*, 416 F.Supp. 100, CA No. 1462–71, decided by this Court November 5, 1975. The plaintiffs here challenge the same conditions and request the same relief. The sole material difference is the class itself: the plaintiff class consists of all those inmates. not members of the plaintiff class in *Campbell*. Plaintiffs therefore ask for summary judgment as to all those issues which have been resolved in *Campbell*, invoking the doctrines of collateral estoppel and judicial notice.

■ The Court finds both doctrines applicable to the present situation. Collateral estoppel requires that the facts sought to be foreclosed from relitigation be the same as in the previous case. *Hurley v. Beech Aircraft*, 355 F.2d 517 (7th Cir., 1966). Those facts and issues must have been fully litigated in the prior action, so that the party against whom the estoppel is sought has had an adequate opportunity to contest the disputed facts. *Hurley v. Beech Aircraft, supra*. The facts subject to the estoppel must have been judicially determined, and must have been material to and in support of the holding. *Hurley v. Beech Aircraft, supra*. Finally, the party against whom the estoppel is sought must be the same party or in privity with the party against whom the original determination was rendered. *Blonder-Tongue Laboratories, Inc. v. University Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971).

■ All of these tests are met here. There could hardly be a case more appropriate for application of collateral estoppel than this one, where all the issues have been fully litigated and resolved. The defendants have had every opportunity to contest the facts involved, and those facts

can no longer be open to any dispute. Even in the absence of the requisite elements of collateral estoppel, the Court could judicially notice the record in *Campbell* to arrive at the same result. See, e. g., *Shuttlesworth v. Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Dixon v. Jacobs*, 138 U.S.App.D.C. 319, 427 F.2d 589 (1970).

The defendants' opposition to plaintiffs' motion raises no arguments which were not raised and decided in *Campbell*. The only legal distinction to be drawn between these two cases is that the plaintiff class in *Campbell* consists of persons not yet convicted of the crimes with which they are charged, while in the present case all class members have been convicted of such crimes. Whatever the force of that distinction in borderline circumstances, the reality of conditions at the D. C. Jail is so bad as to compel the Court to hold that they constitute cruel and unusual punishment for any human beings incarcerated there. In so holding, the Court is cognizant of the expanding meaning of the Eighth Amendment, which evolves from ". . . standards of decency that mark the progress of a maturing society". *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1950).

The current meaning of the Eighth Amendment is apparent in such cases as *Holt v. Sarver*, 309 F.Supp. 362 (1970) affirmed 442 F.2d 304 (1971); *Jones v. Wittenburg*, 323 F.Supp. 93 (1971), aff'd sub nom. *Jones v. Metzger*, 456 F.2d 854; *James v. Wallace*, 382 F.Supp. 1177 (1974); *Costello v. Wainwright*, 397 F.Supp. 20 (1975); *Pugh v. Locke*, 406 F.Supp. 318 (U. S. District Court M.D.Alabama N.D., 1976).

■ *Holt* consisted of eight class actions brought on behalf of inmates in the Arkansas prison system. Plaintiffs argued among other things that confinement under the conditions and practices of that system amounted to cruel and unusual punishment. The Court found that the conditions were indeed such that confinement of persons in the system amounted to cruel and unusual punishment. The significance of *Holt* lies in the Court's recognition that conditions of

confinement themselves under certain circumstances can amount to cruel and unusual punishment. The Court found

"... the concept of 'cruel and unusual punishment' is not limited to instances in which a particular inmate is subjected to a punishment directed at him as an individual. In the Court's estimation confinement itself within a given institution may amount to a cruel and unusual punishment prohibited by the Constitution where the confinement is characterized by conditions and practices so bad as to be shocking to the conscience of reasonably civilized people even though a particular inmate may never personally be subject to any disciplinary action." *Holt* at 372–373.

While the Court believes that the conditions and practices at the District of Columbia Jail on their face are "so bad as to be shocking to the conscience of reasonably civilized people", *Holt*, supra, it finds further support for this position in the analogous cases of *Jones, James, Costello,* and *Pugh.* Each deals with the abridgment of constitutional rights of sentenced prisoners. Each deals with one or more of the factual issues before the Court in the instant case. *Jones* and *Pugh* (which was consolidated with *James*) are of particular significance in that the facts leading the Court in one to find cruel and unusual punishment are very similar to the facts of the other and of those in *Campbell v. McGruder, supra,* and therefore facts in the instant case.

*Jones* was a class action brought on behalf of all prisoners in the Lucas County (Ohio) Jail. The class included both sentenced inmates and pretrial detainees. *Pugh* was a consolidated class action brought on behalf of all inmates incarcerated in Alabama state penal institutions and subjected to conditions in violation of their Eighth and Fourteenth Amendment rights. Similarly, in the present case the Court has been asked to provide relief to all non-pretrial detainees at the District of Columbia Jail.

The Courts in both *Jones* and *Pugh* held that the conditions in the respective prisons or prison systems constituted cruel and unusual punishment. Both decisions base their determinations of law on findings of fact similar to those found by this Court in *Campbell v. McGruder,* 416 F.Supp. 100 (CA 1462–71) and judicially noted as the basis of this decision. These are overcrowded, unsafe and unsanitary conditions, lack of proper care for inmates with psychiatric problems, lack of recreation and overly restrictive visitation rights.

In *Campbell* this Court noted that overcrowding was the most flagrant and shocking encroachment on the constitutional rights of pretrial detainees at the D. C. Jail. The *Jones* and *Pugh* Courts similarly emphasized overcrowding. The Lucas County Jail in *Jones* was built in the last decade of the 19th century and was about 76 years old at the time of the decision. The Jail was designed to hold 150 prisoners, has held up to 272 and at the time of the opinion was holding 200. Inmates in the Lucas County Jail were held in two-man cells each 6 x 9 feet in floor area. The cells are equipped with two bunks, a toilet and sink with running cold water. The Alabama District Court was equally concerned with overcrowding in *Pugh* when it cited population statistics for the four principal institutions in the State prison system, showing actual capacity running one-third or more over maximum capacity.[1] Overcrowding in the D. C. Jail is equally bad, as the *Campbell* litigation has demonstrated. Indeed, the cells in the D. C. Jail are even smaller than those outlined in *Jones* (6' x 7' 10", compared to 6' x 9') and often house two men.

All three Courts have noted the unsafe and unsanitary conditions existing at each prison facility. In *Jones* the Court noted that when a prisoner enters the Lucas County Jail he is given a towel which is replaced once a week. He is also given a blanket which may or may not have been washed before it was issued, and usually but not always a mattress consisting of a

---

1. Fountain (maximum capacity of 632, actual capacity of 1,000); Holman (maximum of 540, actual 750); Draper (maximum 632, actual 1,000); Kilby (maximum of 700, actual 700).

small piece of foam rubber. The Court in *Pugh* also notes the issuance of old and filthy mattresses leading to the spread of contagious diseases and body lice. Similarly, inmates at the D. C. Jail are frequently issued old mattresses, not cleaned or sterilized and stained with urine and other excreta.

The *Jones* Court listed other health and safety hazards including a dishwasher unable to meet health standards, food storage not in accordance with health regulations, improper ventilation in the kitchen, and a kitchen crossed by leaking water and sewage pipes. The *Pugh* Court paints a similar picture of conditions in the Alabama system, i. e., broken windows, inadequate heating or ventilation, exposed wires, poor lighting, broken plumbing, roaches and other vermin, unsanitary food service conditions. In *Campbell* this Court noted the equally base conditions in the D. C. Jail. The Court pointed to the myriad violations of the District of Columbia Building Code, Housing Regulations, Health Regulations, Food Regulations and Fire Code. The Court also noted that there were rats, mice and roaches in abundance at the Jail.[2]

All three Courts found constitutionally inadequate health care in their respective institutions. In *Jones* the Court found the health facilities in general to be primitive. In *Pugh* the Court pointed out that 10% of its inmates were considered psychotic, while another 60% were disturbed enough to need treatment. The Court in *Campbell* found that the D. C. Jail was similarly unequipped to treat patients with psychiatric problems. In addition to the lack of treatment noted in the other cases, the Court found frequent use of ordinary handcuffs and leg irons to shackle some severely disturbed inmates to their beds.

Parallel findings also exist as to the lack of adequate recreation for the incarcerated. In *Jones* there were no recreation facilities, while the Court in *Pugh* found them inadequate. The Court in *Campbell* emphasized the lack of adequate recreation both in time and space. It pointed out that prisoners on deadlock receive no outdoor recreation time and only one-half hour daily of "tier" recreation.

Finally, both the *Jones* and *Pugh* Courts found that certain limitations on visiting privileges also constituted cruel and unusual punishment. In *Jones* the Court found that prisoners were only permitted visits on Saturday afternoons from 1 to 4 p. m. Visits had to be conducted through heavy screening. The Court in *Pugh* found that the irrational classification system in Alabama institutions prevented visitation for certain inmates. This Court in *Campbell* similarly found lacking any rational classification system at the D. C. Jail for allowing contact visits for inmates there.

Other cases also deal with individual issues in the instant one. See, e.g., *Costello v. Wainwright, supra,* where the Court issued a preliminary injunction to reduce inmate population in the Florida Corrections system after finding that overcrowding and the resulting deprivations in medical and psychiatric care amounted to unconstitutional cruel and unusual punishment. The Court has also been guided by cases specifically noting the rights of prisoners to adequate medical and psychiatric care. See *Negron v. Preiser,* 382 F.Supp. 535 (1974), *Battle v. Anderson,* 376 F.Supp. 402 (1974); *Finney v. Arkansas Board of Correction,* 505 F.2d 194 (1974).

The Court is also persuaded that the conditions and practices in the D. C. Jail are not rational means of advancing a valid state interest, and that the reality of conditions at the Jail subvert the legitimate purposes of incarceration. See *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).

It is apparent, therefore, that the conditions in which inmates are housed at the D. C. Jail constitute cruel and unusual punish-

---

2. These findings were subsequently confirmed by the court-ordered inspections of the Jail, which found literally thousands of violations.

ment in the sense currently contemplated in American society. These conditions simply are not to be tolerated in a civilized society, much less in our national capital. These are conditions which turn men into animals, conditions which degrade and dehumanize. In some senses the punishment they inflict is more painful and enduring than the stocks or the rack, long since discarded as barbaric or primitive. Imprisonment in conditions such as these absolutely guarantees that the inmates will never be able to return to civilized society, will never feel any stake in playing by its rules. For imprisonment under such conditions, where a man may be stuffed into a tiny cell with another, surrounded by the nocturnal moans or screams of mentally disturbed but untreated fellow inmates, plagued by rats and roaches, sweltering by summer and shivering by winter, unable to maintain significant contact with his family in the outside world, sometimes going for long periods without real exercise or recreation, can only have one message for him: society does not acknowledge your existence as a fellow human being. And when that message is delivered in the D. C. Jail, whatever small chance may have existed that a person might act as though he were a member of a civilized society is obliterated, along with his decency and humanity.[3]

3. The Court has confirmed the continuing nature of the conditions by a personal visit to the Jail on April 7, 1976, as well as by extensive hearings conducted on April 29th and 30th, 1976 with regard to the instant motion for summary judgment and pursuant to the remand directions of the Court of Appeals in *Campbell*. The specific findings made as a result of those hearings are also issued today by the Court. They indicate, in sum, that the conditions at the Jail continue to violate the constitutional rights of the inmates on a daily basis. There are however certain matters which, because of changes in the situation at the Jail since the Court's order of November 5, 1975 (including the partial opening of the new detention facility), require different treatment today than they did at that time.

In their report to the Court with respect to corrective action taken as a result of health, fire, safety, building and food inspections at the Jail (paragraph 1, Order of November 5, 1975), the defendants indicated that certain violations would not be remedied because the portions of the Jail involved were soon to be vacated. It now appears that cell blocks 3 and 4 and the dormitory area will remain in use for the indefinite future. The Court therefore orders remedial action in those portions of the Jail.

It appears to the Court that the defendants have complied with paragraph 2 of the November 5th order (clothing, linen, towels) and that no further action is required in that regard.

With respect to contact visits (paragraph 4 of the November 5th order), the latest hearings in this case and in *Campbell* indicated that the defendants plan to seal off the area at the Jail currently suitable for such visits, and that the new facility is prevented from affording contact visits by the presence of plexiglass barriers in the visiting area. The evidence in *Campbell* also shows, however, that contact visits are afforded to some prisoners at defendants' Lorton facility. There are obvious equal protection problems inherent in this situation, especially considering the fact that the convicted persons at Lorton are felons, whereas the convicted persons at the Jail are misdemeanants. The Court does, of course, realize that there may be valid security reasons for prohibiting contact visits in correctional institutions. Such a determination must, however, be the result of a reasoned analysis of the relevant factors, which the defendants' practice is clearly not. The Court nevertheless believes that it is the Department of Corrections which must make this analysis in the first instance, and therefore directs it to do so.

The Court believes that defendants are complying with paragraph 5 of the November 5th order (medical inspections of food handlers).

The overcrowding at the Jail is clearly the single most severe problem that the Court has faced in this case and in *Campbell*. Since the entry of the Court's original interim overcrowding order more than fourteen months ago, that situation has continued to plague the institution. As today's findings in *Campbell* indicate, a significant number of approaches remain available to defendants to alleviate this problem. Today's findings in *Campbell* also indicate, however, that there has been no substantial effort on the part of high level city and corrections officials to pursue these possibilities, which the Court believes—taken together—could virtually eliminate overcrowding. As the Court notes today in *Campbell*, apparently only pressure of a continuing and daily nature will suffice to motivate these officials to fully exhaust the possibilities open to them. The Court therefore today enters an order which, it expects, will create such pressure and will protect the constitutional rights

Accordingly, it is by the Court this 24th day of May, 1976,

ORDERED:

1) That plaintiffs' motion for partial summary judgment be, and hereby is, granted; and

2) That defendant shall forthwith initiate action to correct all remaining violations reported to the Court in response to the Court's order of November 5, 1975 in *Campbell v. McGruder*, insofar as those violations relate to cell blocks 3 and 4, the dormitories, the food service area, and any other areas currently expected to continue in use beyond July 1, 1976. A report of the remedial action taken to correct each violation shall be submitted to the Court and to counsel in this case no later than July 15, 1976; and

3) That defendants shall provide at least one hour of out-door recreation daily for each resident of the Jail, except for medical patients and work crew; and

4) That defendants shall, no later than August 1, 1976, adopt a comprehensive policy with regard to "contact visits" at Department of Corrections facilities, taking into account the security of the institutions involved, differences among those institutions, the desirability of equal treatment of similarly situated inmates, and any other factors the Department considers relevant. Defendants shall submit such a policy statement to the Court upon completion, and shall accompany it with an expression of the rationale for the policy so adopted; and

5) That the defendants shall establish the following procedures at the Jail and the new detention facility: In the event an inmate displays unusual behavior suggestive of possible mental illness, such behavior shall be immediately reported to the medical staff. The inmate will be seen by a psychiatrist within twenty-four (24) hours. If the inmate is found to be mentally ill, he will be transferred within forty-eight (48) hours of such finding to a hospital having appropriate facilities for the care and treatment of the mentally ill; and

6) That defendants shall establish the following procedures governing use of restraints:

a) inmates requiring restraints will be housed only in a hospital setting, and not with the general population;

b) unpadded handcuffs and leg irons shall not be used under any circumstances. Medically appropriate restraints, padded or pliable to prevent injury to the inmate, may be utilized;

c) restraints may be imposed only on the specific written authorization of a medical doctor;

d) if required in an emergency situation when a doctor is not present, a Medical Technical Assistant (MTA) or a Registered Nurse may order the temporary use of restraints, subject to the receipt, by telephone or otherwise, of approval from a medical doctor within two (2) hours of the imposition of such restraints;

e) a log will be kept reflecting the use of restraints, and stating for each such use the name of the person restrained, the date and time he was placed in restraints, the name of the doctor approving the use of restraints, and the time of such approval;

f) orders by a doctor authorizing the use of restraints are valid for twenty-four (24) hours only, and if no further written order has been entered within that period, the inmate shall be released from restraints;

g) no restrained inmate shall be housed in such a manner as to permit access to him by non-restrained inmates, with the exception of inmates approved by the medical staff for employment in the hospital area; and

7) (a) that defendants, their agents, servants and employees are enjoined after June 1, 1976 from housing more than 960

---

of plaintiffs in this action. The Court is confident that no inmate in the custody of the Department of Corrections need ever be released under today's order unless the high city and corrections officials ultimately responsible for ·

operating the corrections system feel that it is easier to continue their current inaction than to vigorously pursue their responsibility to the citizenry they serve.

persons at the New Detention Facility, and more than 215 persons in cell block 4, 161 persons in cell block 3, 110 persons in dormitory 1 and 91 persons in dormitory 2 at the old Jail;

(b) that after July 1, 1976 no persons shall be housed in cell blocks 1 and 2 at the old Jail;

(c) that if compliance with this order requires a reduction in the inmate population at either facility, and other efforts to reduce the population are not successful within forty-eight (48) hours after compliance ceases, the Director of the Department of Corrections and the Superintendent of Detention Services are directed to release on their own recognizance, within forty-eight (48) hours of the admission to either facility of persons in excess of the numbers stated in paragraph 7a of this Order, those pre-trial detainees held in default of the lowest amount of bail, and among those detainees held in the same amount of bail those held for the longest time, until compliance with this Order is obtained; provided that if the Board of Judges of the Superior Court, or the Chief Judge thereof, specify a different method of selecting the persons to be released, the defendants shall be governed accordingly;

(d) that the defendants submit to the Court and serve on opposing counsel within forty-five (45) days their plan to reduce the population and/or increase the facilities available to house committed persons so that future overcrowding may be avoided; and

8) that there being no just reason for delay, the Clerk shall enter this order as a final judgment pursuant to F.R.C.P. 54(b).