Michael J. **FEROLA**

v.

John **MORAN, et al.**

Civ. A. No. 81–0041P.

United States District Court,
D. Rhode Island.

Nov. 22, 1985.

Ernest Barone, North Providence, R.I., for plaintiff.

Stephen Robinson, Dept. of Corrections, State of R.I., Cranston, R.I., for defendants.

## OPINION AND ORDER

PETTINE, Senior District Judge.

The plaintiff, Michael J. Ferola, has brought this civil rights action, 42 U.S.C. § 1983 against John J. Moran, Director, Department of Corrections; Matthew Gill, Assistant Director; Stafford Quick, Associate Director; Paul LaRochelle and Captain House, guard officers; and certain medical personnel of the Adult Correctional Institutions, namely, Chuck Dawson, a psychologist; Dr. Bernard Duval, a psychiatrist; Dr. Karoly Kun, a physician; and nurses Audrey Heon, Louise Donnelly and Joanne McNamara. Ferola asserts that while incarcerated as an inmate at the ACI, he was physically abused and denied psychiatric care, in violation of the rights guaranteed to him by the Eighth Amendment to the United States Constitution; he seeks damages and equitable relief. For reasons

hereinafter stated, judgment is rendered in part for the defendants and in part for the plaintiff.

This case was tried to the Court and by agreement of the parties, hearsay evidence, letters, documents, and the like were accepted as though properly admitted. The evidence developed the following facts.

## I. FACTS

### 1. *Psychiatric care:*

The plaintiff is a 25 year old inmate currently serving a ten year term for robbery and rape. The sentence was imposed in October of 1978. From the commencement of his term to at least 1981, his incarceration has involved a bizarre sequence of aberrant behavior. He candidly testified that within a week of his imprisonment he intentionally injured himself, and thereafter, over a period of approximately three years, periodically did so on sixty different occasions. Most of these incidents required the plaintiff to be hospitalized for approximately a week or more; he described these episodes as "cutting myself," "smashing my hand into the wall," and "setting cell on fire." He was placed under the care of Dr. Bernard Duval, the prison psychiatrist, who saw him "at least once a week" from 1978 to November of 1980. When asked to give reasons for his behavior, he replied, "one was places that I didn't want to be, fear of being same place, refusing to move me. I felt that as my means of getting out. Other times it was depression. I was young I didn't want to do time. Other times was out of hostility because of the way I was being treated."

Ferola's deviant behavior manifested itself prior to his present imprisonment. As a youth, he was examined or treated at four different medical facilities and placed in special schools and group homes. At age 14, he was sent to a special school for severely anti-social youths where he was diagnosed as having a severe character disorder. There is no doubt, as evidenced by the medical records introduced in this case, the plaintiff had a long standing, deeply rooted antisocial personality disorder when he started serving his current sentence.

A general survey of his prison disciplinary record commencing in 1979, reveals approximately eighty-five infractions; thirty-two went before a disciplinary board; as a result he was deprived of parole time. Throughout his imprisonment he has received medical attention from Dr. Duval, the prison psychiatrist. Dr. Bauermeister of the State's Department of Mental Health, who was called by the defendants as an expert, analyzed Ferola's condition and the treatment he received. He told the Court that there are no effective methods for treating a person who has an anti-social personality and that Dr. Duval, who is a psychiatrist as well as a physician, utilized both his medical and psychiatric skills in caring for Ferola. Dr. Bauermeister stated that "[p]sychiatrists with M.D. degrees are a scarce commodity and in general they are used exclusively to prescribe medication. From reading the notes carefully I have had the feeling that Dr. Duval extended himself way beyond [the limited] definition of his task and did attempt counselling with Mr. Ferola;" he pointed out that in 1979, Dr. Duval saw Ferola 20 times and in 1980, 39 times. In addition to providing counselling, Dr. Duval, from time to time, placed Ferola in a "lock-up-feed-in" status, and prescribed drugs to control his behavior.

In short, Dr. Duval exhausted every available means of helping Ferola but was frustrated at every turn. He finally concluded that further treatment was of no avail; as he states in his notes, "I tried to treat Mr. Ferola though there is no known treatment for anti-social personality; it led to nothing so I will stop." Dr. Bauermeister felt that Dr. Duval was completely correct in his diagnosis and supported Dr. Duval's conclusion of the futility of further treatment, as demonstrated by the course of Ferola's behavior. He referred to the record, which shows that increased treatments did not lessen the number of infractions committed by Ferola; indeed, in the years in which there was no treatment, Ferola's infractions dropped.

A further elaboration of Ferola's psychiatric condition is not necessary. It is clear and uncontradicted that he is a manipulative individual who uses self-injurious behavior to improve his condition at the prison; there is no question he is the victim of an anti-social personality disorder for which there is no cure; however, in this case, Dr. Duval administered treatment to Ferola above and beyond the reasonable requirements and duties of a prison doctor.

The plaintiff's own evidence, a report from Dr. T.J. Chamberlain, a psychiatrist, is compatible with Dr. Duval's diagnosis, treatment and care. The plaintiff relies heavily on Dr. Chamberlain; however, I fail to see how his testimony gives any support to plaintiff's position. The language quoted to the Court is as follows:

> His psychiatric history is not compatible with a psychotic process (e.g. schizophrenia or manic depressive illness), a psychoneurotic process (dysthymic disorder, compulsive disorder, etc.) or as an organic syndrome, (e.g. mental retardation, seizure disorder, etc.). His history is compatible with a personality disorder, i.e., anti-social personality disorder as defined in DMS III of the American Psychiatric Association. Although there are well defined treatment modalities for the psychotic, psychoneurotic and organic disorders, the treatment for personality disorders, and particularly the anti-social disorders is not well defined, and is controversial. He has been treated with some of the proposed therapeutic interventions, e.g., a group home with group and individual therapy without any detectable improvement. It should be noted that the anti-social personality is at best, very difficult to treat, and has a very poor prognosis. Optimal therapy within a confinement system would consist of a combination of group therapy and medication, if indicated. Lithium was utilized without any significant improvement even though the blood levels were well within therapeutic range. Lithium is not indicated for anti-social personalities, and Dr. Duval apparently ordered it on an empirical basis, and on the patient's request. Group therapy, if available may have proved beneficial, although his earlier inability to respond would indicate that his outcome with group therapy would not be significantly different.

> Anti-social personalities, under the best of circumstances are very difficult to treat. The only aspect of his care that could be addressed is the global one of the prison having vocational rehabilitation facilities, and group psychotherapy. In terms of his psychiatric condition being exacerbated by the alleged lack of treatment, it should be noted that anti-social personalities are remarkably stable over time, that any change is usually short lived, and in reaction to environmental changes.

The foregoing statement is supportive of, and consistent with Dr. Duval's diagnosis. The only ingredient missing from Dr. Duval's prescribed treatment of Ferola is the group therapy. Even here, however, Dr. Chamberlain states that Ferola's "outcome" with group therapy would not have been significantly different. The plaintiff argues that even though an anti-social personality is difficult to treat, it should not be ignored. Ferola was not ignored however; in fact, there was almost solicitous concern for him.

### 2. *Physical Abuse*

On November 5, 1980, Mr. Ferola severely cut himself. As a result of this self-inflicted injury he was taken to the Rhode Island Hospital, a community based medical facility, where the wound was treated and sutured. At 5 p.m. of the same day he was returned to the prison in the charge of Lt. LaRochelle who testified that Ferola was very upset and stated that regardless of what was done for him he was going to injure himself again because he wanted to be confined in the prison hospital.

Dr. Duval was contacted. He gave instructions to the nurse, which were passed on to Lt. LaRochelle, that Ferola's cell was to be stripped bare and that he was to be shackled and handcuffed to prevent any further self inflicted injuries. At 5 P.M.

these orders were executed; Ferola was shackled in a supine position. Each arm was extended over his head and handcuffed to the bed—his legs were spread and likewise shackled. The defendants claim each arm could be moved up or down by one to one and a half feet; the plaintiff disputes this claim and alleges that he was only able to move his arms 6 inches and his left arm not at all once the left cuff had slipped down the cot leg. The evidence supports the conclusion that for approximately 20 hours (5 P.M. Nov. 5 to 1 P.M. Nov. 6) he was shackled to his bed and that for approximately fourteen consecutive hours (5–5:30 P.M. to 7–7:30 A.M.) of the 20 hours he was restrained in spread eagle fashion as described.

Throughout the night Ferola yelled, screamed, strained at the shackles and continually moved them back and forth to create noise—hoping that the other inmates would join in general noise making; he further claims he was in pain, experienced numbness in his arm, was denied toilet facilities and was forced to lie in his own urine. There is no evidence, other than Ferola's testimony, supporting the claim that he was forced to lie in his own urine. The log book for that day, which would note whether or not the sheets had to be changed, was destroyed in a fire. Lt. LaRochelle testified, however, that the sheets had not been soiled. Lt. LaRochelle, while admitting that Ferola was never taken to the toilet between 5 P.M. Nov. 5 and 7:30 A.M. Nov. 6, also testified that Ferola never asked to be released to use the toilet during those 14 hours. Because it is reasonable to assume that one would be required to use the toilet during a 14-hour time span, I accept as credible Ferola's testimony that he was denied access to a toilet during this period.

Nurse Audrey Heon testified, through interrogatories, that she saw Ferola while he was shackled to his bed, that he was agitated, and that he requested that the cuffs be loosened. She stated "apparently, the cuffs had slipped down the legs of the bed and I pulled them up to the top of the bed in an attempt to make him as comforta-

ble as possible ... I recall speaking to one of the officers regarding the plaintiff's request that his cuffs be loosened. I do not recall to whom I spoke to, but his request was not granted ... yes, I spoke to the superior officer on duty regarding his complaint." Plaintiff's exhibit 8. At a subsequent evidentiary hearing Ms. Heon testified that she received no instructions to monitor medically Ferola and that she only saw him once on the night in question, in response to a complaint from him as to the dressing on his self-inflicted wound. She also stated that a check was made of the cuffs—these were loose—and that she did not believe he had soiled the bedding because if he had she would have remembered.

Sometime after his release from restraints, Ferola was again sent to the Rhode Island Hospital as directed by the prison doctors. He was diagnosed as having brachial plexus apraxia—that is, neural damage to the arm and shoulder. Dr. Chamberlain gave his opinion that the condition was caused by the November 5–6 incident. On the other hand Dr. Karoly Kun, the defendants' medical expert, who unlike Dr. Chamberlain, examined the plaintiff after the incident, testified that he thought the injury was caused by Ferola's constant straining against his shackles.

On November 6 Dr. Duval made an entry in the record; this entry shows that Ferola must have been a continuing problem and further reveals Dr. Duval's attitude toward shackling. It reads as follows:

Lt. Erikson, BCU, called and asked what I was going to do about my "kid" referred to Ferola. Since return to BCU, inmates have been attempting to be returned to Dispensary. In fact, early this morning, he told Mr. Guerin that he would get back here somehow.

He has been superficially slashing his wrists and beating his head against wall. So far, his self-inflicted injuries have not been such that he has had to be placed in the Dispensary for medical or surgical reasons. He may very well harm him-

self sufficiently to receive such placement.

Can this be prevented?

1. Were I to place him in observation he still could harm himself and would if his placement were not satisfactory to him. Therefore, to place him in the rear room now would be to consent to being manipulated with no reasonable end in sight.

2. Should I load him up with Thorazine, whether in BCU (Behavioral Correctional Unit) or in Dispensary? This kind of pharmaceutical behavior control is acceptable to totalitarians but is repugnant to our culture and ethical values. There is no psychiatric ground present at this time for an invasive pharmaceutical intervention.

3. Should he be restrained physically in order to reduce the likelihood of serious self-injury? This non-invasive procedure impinges less immediately on his integrity and exposes him less to personal degradation, although it appears more brutal. Physical restraint would seem to be the response of choice, however short of ideal it may be.

4. Must he be placed in the Dispensary to be restrained? No! Physical restraint, whether short lived or more prolonged, is a proper custodial activity. Custodial authorities, for a variety of reasons, do not like to be involved in more prolonged physical restraint. While I can sympathize with them, I can not agree that dislike for an acceptable procedure is a sufficient reason to shift the burden to the medical staff under the arbitrary and false rubric that the inmate is "crazy and belongs in the rear room". Consequently, in response to Erickson's call, I advised him to follow custodial procedure, assuring him that Ferola is not a psychiatric patient. Psychiatric Contract Notes, November 6, 1981, Pl's ex. 14.

To understand the motivation for the November 5, 1980, shackling, Ferola's repetitive self-injurious conduct must be kept in mind. Dr. Wolf Deery, the health care administrator for the Department of Corrections, testified that Ferola was "extremely manipulative and demanded his own way"; to accomplish his end, he would injure himself and as the doctor stated, the concern was "that while people like Mr. Ferola are not generally suicidal and are also not generally psychotic, that they occasionally do hurt themselves. They accidentally do a better job than they thought they could, and seriously injure themselves." Dr. Deery therefore indicated that there are times when shackling is necessary to minimize the probability of self-injury.

## II. LEGAL STANDARD:

This section 1983 complaint is a two-pronged accusation. It charges that the defendants have subjected the plaintiff to cruel and unusual punishment, in violation of the Eighth Amendment to the Constitution, by denying him needed psychiatric care and by cruelly and abusively shackling him to his bed.

■ The Eighth Amendment proscribes, not only physical torture and other barbarous methods of punishment, but also other penal measures that are "incompatible with 'the evolving standards of decency that mark the progress of a maturing society' ", *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958), that "involve the unnecessary and wanton infliction of pain," *id.* at 102, 97 S.Ct. at 290 (quoting *Gregg v. Georgia*, 478 U.S. 153 (1976)), and that punish individuals in gross disproportion to the severity of the crime, *id.* at 103, n. 7, 97 S.Ct. at 290 n. 7 (citations omitted). *See* generally *Nadeau v. Helgemoe*, 561 F.2d 411, 413–14 (1st Cir.1977).

■ It is now established that the Eighth Amendment requires the government to provide medical care for prisoners, *Estelle v. Gamble, supra*, 429 U.S. at 103–06, 97 S.Ct. at 290–92 and that "deliberate indifference to serious medical needs of prisoners constitutes 'unnecessary and wanton infliction of pain,' " *id.* at 104, 97 S.Ct. at 291 (quotation omitted), forbidden by the Amendment. In *Estelle* the court

made clear that whether the infliction of unnecessary suffering is caused by a prison doctor's response or lack thereof to inmate needs, or by a prison guard's denial of access to medical care, (or interference with prescribed treatment) "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Id.* at 104–05, 97 S.Ct. at 291. The critical factor in any such instance, however, is that the indifference be not merely inadvertent or negligent, but deliberate, for it is only such deliberate indifference "that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.* at 106, 97 S.Ct. at 292.

■ The response to plaintiff's first complaint, i.e., denial of needed psychiatric care, is simple: he was not denied such care. True, denial of psychiatric care can, under certain circumstances, amount to deliberate indifference as the plaintiff argues citing *Woodall v. Foti,* 648 F.2d 268 (5th Cir.1981), but that just is not the case here. The record abounds with exhaustive notations of doctor conferences, counseling and use of thorazine. Dr. Duval's summation is consistent with that of the plaintiff's own witness (presented through a letter, pl's ex. 13), Dr. T.J. Chamberlain, as I have already discussed. There is no need to labor this facet of the plaintiff's complaint. The evidence fails to prove this allegation. It strains logic to a filament to say that the record of care afforded the prisoner reflects, even in the slightest degree, a denial of psychiatric care or deliberate indifference. Factually and for the reasons recited, the plaintiff's claim that the defendants

were deliberately indifferent to his psychiatric needs, has not been established. On this issue I find for the defendants.

*Shackling*

This aspect of the case presents the much closer question of whether, by shackling plaintiff to his bed for a 20 hour period, under the circumstances indicated in the record, the defendants ran afoul of the Eighth Amendment guarantee.

■ This is not the first case to confront the constitutional propriety of utilizing physical restraints to control prison inmates. *See, e.g., Stewart v. Rhodes,* 473 F.Supp. 1185 (S.D.Ohio 1979), *app. dismissed,* 661 F.2d 934 (6th Cir.1981); *Owens-El v. Robinson,* 442 F.Supp. 1368 (N.D. Pa.1978), *supp.* opin, 457 F.Supp. 984 (W.D. Pa.1978); *Inmates of D.C. Jail v. Jackson,* 416 F.Supp. 119 (D.D.C.1976); *Gates v. Collier,* 349 F.Supp. 881 (N.D.Miss.1972), *aff'd,* 501 F.2d 1291 (5th Cir.1973); *Landman v. Royster,* 333 F.Supp. 621 (E.D.Va. 1971); *Tate v. Kassulke,* 409 F.Supp. 651 (W.D.Ky.1975). These cases establish that, while there is no *per se* constitutional prohibition on the use of restraints such as shackles, chains, handcuffs and the like, courts must review with great care the circumstances surrounding their use in a particular instance to determine whether the strictures of the Eighth Amendment have been satisfied. These cases are, of course, only particular applications of the general rule that no measure [1] instituted by prison officials, whether it be denominated "punishment," "control," "treatment," or

---

**1.** Defendants' argument that the circumstances in question, because they "at best" establish "a single isolated incident of mistreatment," *Defendants' Post-Trial Brief,* at 9, cannot constitute actionable cruel and unusual punishment lacks any basis in law or logic. Nor surprisingly, no case cited by defendants supports the unlikely proposition that the protections of the Eighth Amendment do not apply where there is no pattern or practice of abusive conduct. Indeed, leading cases in this area frequently involve a challenged past, discrete act of alleged cruelty. *See, e.g., Estelle v. Gambel,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). While a pattern may be required to support class-based suits

seeking broad, structural relief, no such systematic deficiencies or acts need be adduced to support a single claim of mistreatment. *See generally Robert E. v. Lane,* 530 F.Supp. 930, 939 (N.D.Ill.1981) (discussing various types of claims under Eighth Amendment). And the distinct question of whether superior officers should be liable for single acts of mistreatment —here, acts claimed by defendants to be permissible under prison policies—must be answered with reference to the general principles of supervisory liability governing § 1983 cases, *see, e.g., Kostka v. Hogg,* 560 F.2d 37 (1st Cir.1977), not be the substantive standards imposed by the Eighth Amendment.

otherwise, *see Trop v. Dulles, supra*, 356 U.S. at 93–95, 78 S.Ct. at 594–95, may inflict wanton and unnecessary pain. And in these cases, as is generally true in Eighth Amendment analysis, the individual circumstances surrounding a challenged measure, including its duration and the objective sought to be served, *see, e.g., Leon v. Harris*, 489 F.Supp. 221, 223 (S.D.N.Y. 1980) weigh heavily.

Indeed, in this case the prison officials are themselves aware that there are certain boundaries within which their use of physical restraint must be confined. The institution's regulations read in pertinent part:

> Mechanical restraints may be used only when reasonably necessary and only in the following instances:.... Under medical advice to prevent an inmate from attempting suicide and inflicting serious injury upon himself and others; mechanical restraints shall never be used.... In a way that causes undue physical discomfort, inflicts physical pain, or in any way restricts the blood circulation or breathing of an inmate. Pl's ex. 7 at p. 4.

Here, there can be no serious question, and I find, that the mechanical restraints were used on Ferola "under medical advice" and to prevent him from inflicting "serious injury" upon himself. The decision to physically restrain Ferola comports with accepted medical standards as of November, 1980; Dr. Chamberlain so stated in his opinion letter of February 18, 1985. Thus, this is not a case like others in this area, where the restraints were used plainly to punish—a circumstance recognized to be repugnant to the mores embodied in our Constitution. *See, e.g., Gates v. Collier, supra; Owens-El v. Robinson, supra; cf. Wheeler v. Glass*, 473 F.2d 983 (7th Cir. 1973) (restraints used for 77 hour period to punish mentally retarded juveniles).

The more difficult question here is whether plaintiff was shackled in such a manner as to violate the institution's own regulation forbidding restraint that causes undue physical discomfort or pain, and to violate the Eighth Amendment. In a sense, this regulation embodies the protec-tions of the Eighth Amendment and the question whether the regulation was violated here merely re-asks the question whether the constitutional standard was satisfied.

■ Looking to the facts surrounding this incident, I find several circumstances deeply troubling. First, although the shackling was ordered in the first instance by Dr. Duval, there was no medical monitoring, control or supervision of plaintiff while he was restrained. Not only was there a failure to give medical instructions, but no doctor or nurse paid periodic visits to plaintiff during the 20 hours—including the 14 consecutive hours of being shackled spread eagled—of his confinement. Nurse Heon did see Ferola, but she apparently lacked control over him, for it was the correctional officers who decided whether to comply with plaintiff's complaint that his shackles be adjusted and wound treated.

One point that courts examining the use of restraints have emphasized is that physical restraint of an inmate should be carried out only under the close supervision of medical officials. *See Stewart v. Rhodes, supra*, 473 F.Supp. at 1193 (where restraints are necessary, "the inmate should receive immediate medical attention and care" and "be under the control of medical personnel"); *Inmates of D.C. Jail v. Jackson*, 416 F.Supp. 119, 124 (ordering that restraints be authorized by medical personnel and be used in hospital setting only); *Owens-El v. Robinson*, 442 F.Supp. 1368, 1380–81 (finding deficient lack of prison policy requiring medical personnel to monitor and check inmate's condition more frequently than on regularly scheduled rounds and asserting that restraints, where necessary, should be used only under "close medical supervision"), *supp. opin., supra*, 457 F.Supp. at 990 (ordering that restraints be authorized by medical personnel and be used in hospital setting only); *Landman v. Royster, supra*, 333 F.Supp. at 648 (restraint should not be used without medical authorization); *cf. Wyatt v. Stickney*, 344 F.Supp. 387, 401 (M.D.Ala.1972) (ordering that use of restraints on institutionalized

mentally retarded persons be medically monitored on half-hourly basis). Here, there was surely warrant for medical monitoring. Given plaintiff's professed determination to injure himself, and defendants' own evidence to the effect that plaintiff tried to injure himself with his shackles (and succeeded, according to defendants' expert Dr. Kun) and that he had already been treated at Rhode Island Hospital, it was of little avail to shackle him *to prevent self-inflicted injury* without monitoring his condition and activity while he was restrained. True, to have shackled him in the prison hospital would have required some capitulation to his strong desire to return there—but to chain him without any meaningful medical supervision posed the very risk to his health that defendants were trying to avoid.

Second, the plaintiff was spread-eagled. Sheer common sense tells us that immobility in such a position for a protracted period of time will cause great physical suffering and the likelihood of injury. In addition, unpadded chains were used by the defendants. Further, I find the plaintiff's testimony credible that he had only six inches of freedom of movement in each arm and leg, and no freedom of movement at all when the cuff slipped down the leg of the bed—although the defendant officers assert that he had one to one and a half feet of movement. The fact that Nurse Heon saw fit not only to lift the slipped cuff, but to relay Ferola's complaint about the tightness of the shackles, suggests, in spite of her assertions they were loose, that they were applied in a restricted and uncomfortable manner, and it cannot be denied the plaintiff made known his extreme discomfort. In light of defendants' assertion that plaintiff continually agitated and strained against his shackles while confined, it is difficult to accord much weight to the testimony given by the defendant corrections officers that they were not aware that plaintiff was experiencing discomfort. Like other courts, I am disturbed by the apparently painful means of restraint employed here. *See Stewart v. Rhodes, supra,* 473 F.Supp. at 1193 (inmates chained,

spread eagled, to beds for periods ranging up to 7 days); *Landman v. Royster, supra,* 333 F.Supp. at 648 (quoting American Correctional Association Manual's rule that shackling should not be done "so as to enforce cramped position"); *cf. Inmates of D.C. Jail v. Jackson, supra,* 416 F.Supp. at 124 (ordering that only "medically appropriate" padded and pliable restraints be used). Here again, had control been given to medical personnel, the pain plaintiff claimed to have been suffering could have been mitigated.

Third, although the evidence is again divided, I feel the record supports the finding that plaintiff was denied access to a toilet for at least fourteen consecutive hours. It plainly works great and gratuitous suffering on an individual to deny him, for so many hours, the opportunity to "respond to a call of nature," *Landman v. Royster, supra,* 333 F.Supp. at 647; *accord Stewart v. Rhodes, supra,* 473 F.Supp. at 1103. Once again, I must conclude that if plaintiff had been under the close supervision of medical officials while shackled, this unnecessary pain would not have been inflicted.

Taken together, and considered in the context of prior decisions, the circumstances surrounding plaintiff's shackling certainly raise a close Eighth Amendment question. True enough, there are countervailing considerations here. No one disputes that plaintiff was an incorrigible, indeed impossible, difficult, individual afflicted with serious behavioral problems. He may well have required very restrictive restraining. Viewed in the context of plaintiff's repeated attempts to injure himself, I am inclined to believe that he continued to behave obstreperously while chained, and that he may have continued in his attempts to injure himself by agitating and pushing against his restraints. In this regard, the testimony of Dr. Kun, who examined plaintiff after the shackling and believed that his own actions caused the shoulder injury, carries somewhat more weight than that of Dr. Chamberlain, who thought the manner of restraint caused the injury. Dr. Chamberlain never examined plaintiff, nor saw

the restraints, and is a psychiatrist by specialty.

Nonetheless, as I have said, the fact that plaintiff was a difficult individual should have given the defendants more, not less reason, to monitor his condition closely. And while the circumstances here were, in certain ways, not as egregious as those presented in some of the cases cited earlier, the fact remains that, where an individual has been chained spread eagled to a bed for a total of 20 hours without meaningful and frequent medical monitoring, and has been denied toilet access for 14 hours, the evolving standards of decency in our society have been compromised and unnecessary pain has been wantonly inflicted.

The plaintiff's action against the named defendants, Chuck Dawson, Dr. Karoly Kun, and Nurses Joanne McNamara, Audrey Heon, and Louise Donnelly, is easily disposed of; there simply was no evidence to substantiate this complaint against them. Accordingly, judgment is entered in favor of these named defendants.

There is no evidence that Matthew Gill, and Stafford Quick in any way "participated" or had any "affirmative link" between the occurrence and the adoption of any policy showing they authorized or approved of the misconduct set forth herein, *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Accordingly judgment is hereby entered for these defendants.

██ All policies, practices and administrative procedures are set by and are under the control of the Director John Moran. *See* R.I.G.L. 42–56–10. It is clear that he set no policies to safeguard inmates against unconstitutional conduct on the part of his subordinates. His administrative policy statement, Ex. 7, is unmistakable evidence of his knowledge of the abuses that can exist as to the shackling of inmates. Yet his disregard for the constitutional rights at stake, in a fact situation as exists here, is an acquiescence or approval of such conduct. He must be held responsible.

Lt. Paul LaRochelle was the officer in charge up to 11 P.M. From 11 P.M. to 7 A.M., Capt. William House was in charge. A Lt. Erickson took over at 7 A.M. November 6, but he is not named as a defendant. There is direct evidence of LaRochelle's participation in the shackling of Ferola; this, of course, was because of his supervisory position. There is no evidence as to House excepting that he was the captain in charge from 11 P.M. November 5 to 7 A.M. November 6.

██ It is the combined periods of time that give rise to an Eighth Amendment violation. I hold Lt. LaRochelle responsible because of his participation; and though it is true, that if the shackling of Ferola lasted only for the duration of LaRochelle's shift, it might not have constituted a constitutional violation; at a minimum he should have taken steps to free Ferola before going off duty, which he did not do, and this permitted the condition to continue. It may be that Capt. House is equally guilty. However, there is not a shred of evidence as to his duties that night and whether in their performance he would have become aware of Ferola's circumstances. Logic dictates he must have known; unfortunately human conduct is not always logical. Therefore, I cannot find him guilty of a constitutional violation.

Accordingly, judgment is entered against John Moran and Paul LaRochelle.

*Damages:*

The damages are confined to the trauma of the twenty hour "spread eagle" shackling of Ferola; there were no hospital bills or other damages such as permanency of the injury and loss of earning capacity and wages. However, the plaintiff is certainly entitled to recover for the trauma, pain and suffering he endured. The First Circuit Court stated in *Maguett v. Pelletier,* 488 F.2d 33 (1973), "This is not to say that in a civil rights action a plaintiff who proves only intangible loss of civil rights or purely mental suffering may not be awarded substantial compensatory damages." *Smith v. Sol D. Adler Realty Co.,* 436 F.2d 344, 350–51 (7th Cir.1970); *Donovan v. Rein-*

*bold,* 433 F.2d 738, 743 (9th Cir.1970). *See also Morales v. Benitez de Rexach,* 541 F.2d 882 (1st Cir.1976).

■ The maximum permissible compensatory award here must include the physical and psychological injury suffered, and it must accord with the evidence. Based on the record established in this case, I settle on the sum of one thousand dollars: Judgment is entered for the plaintiff as against the defendant John Moran in the amount of $1000.

### Equitable Relief[2]

■ The facts in this case make it clear that equitable relief is warranted. Using the criteria established by the Federal Prison System as a guide, Program Statement: Number 5566.2, Date: June 18, 1982, Subject: Use of Force and Application of Restraints on Inmates, Effective Date: July 26, 1982, it is hereby *ordered:*

## USE OF RESTRAINTS

a. The correctional supervisor in charge of the shift may authorize and will ordinarily supervise the application of restraints necessary to gain control of an inmate who appears to be dangerous because:

(1) The inmate assaults any person;

(2) The inmate destroys government property;

(3) The inmate attempts suicide;

(4) The inmate inflicts wounds upon self; or

(5) The inmate displays signs that such violence may be imminent.

Restraints should be used only when other effective means of control have failed or are impractical. The use of restraints on such occasions is to be documented (see Paragraph 6). Restraints may not be applied as punishment. Drugs may not be used as a restraint solely for security purposes.

b. Except where the immediate use of restraints is required for control of the inmate, staff may apply restraints to, or continue the use of restraints on, an inmate while in a cell in administrative detention or disciplinary segregation only with approval of the Director of Corrections or designee. Where immediate use of restraints is indicated, staff may temporarily apply such restraints to an inmate to prevent that inmate from hurting self, staff, or others, and/or to prevent the destruction of government property. When the temporary application of restraints is determined necessary, the Director or designee is to be notified immediately for a decision on whether the use of restraints should continue.

c. Staff shall seek the assistance of mental health or medical staff upon gaining physical control of the inmate. Where possible, staff shall seek such assistance at the onset of the violent behavior. (so that there be no misunderstanding this is mandatory)

d. Where mental health or medical staff determine that an inmate requires continuing care, the deciding staff shall assume responsibility for care of the inmate, to include possible admission to the institution hospital.

---

**2.** At the conclusion of his case and in a telephone conference with the Court, the plaintiff moved to amend the complaint to include a prayer for declaratory and equitable relief. The defendants strongly objected claiming surprise and prejudice.

Plaintiff argues that the original complaint did seek equitable relief and was not lost by the subsequent amended complaint which failed to reiterate such claim; he filed a motion to amend only as a precaution.

I grant the leave to amend the complaint even though both the original complaint and the first amended complaint, in my opinion, include a prayer for declaratory and equitable relief. In the first complaint, plaintiff seeks "to stop defendants from shackling and handcuffing plaintiff or anybody else." In the first amended complaint, while plaintiff does not specifically mention equitable relief in paragraph V (relief), he does cite and rely upon the statutory provisions providing for equitable and injuctive relief in section IV statement of claim/facts. In view of the fact that plaintiff prepared both complaints *pro se,* defendants were on notice to read the complaints in their entirety. Defendants may be heard on the relief that has been granted if they so request.

e. When it is necessary to restrain an inmate for longer than two hours, staff shall apply to the inmate medically acceptable restraints (ordinarily leather). The restraints may be attached to an appropriate bed, approved by medical staff. Staff shall check the inmate at least every 30 minutes and the medical staff shall monitor the inmate every two hours both to ensure that the restraints are not hampering circulation and for the general welfare of the inmate. When an inmate is restrained to a bed, staff shall periodically rotate the inmate's position to avoid soreness or stiffness.

The 30 minute checks by the staff and the two hour monitoring by the medical staff are to be documented and are to continue until removal of the restraints.

Soft restraints shall be used when an inmate is restrained to a bed, regardless of duration. Hard restraints may be used only if the use of soft restraints would be or have proved ineffective.

f. Except as stated in paragraph (e) above, staff may not secure an inmate to a fixed object, such as a cell door or grill work.

USE OF FORCE Staff shall use only that force necessary to gain control of the inmate. Staff shall apply restraints (for example handcuffs) to the inmate who continues to resist after staff achieve physical control of that inmate. If, after being controlled or restrained, the inmate refuses to move to another area on his own, staff may physically move that inmate by lifting and carrying the inmate to the appropriate destination.

When it becomes necessary to control an inmate who has become disruptive or threatening to staff, inmates, or others, staff may take the steps necessary to restrain the inmate. Only that force which is necessary to gain control is permitted. In no event is the use of physical force justifiable as punishment. If the inmate continues to resist after physical control is gained, restraints (for example, handcuffs) may be used. In applying such restraints, it is again emphasized that only the force necessary may be used. Where practicable, several staff members should assist in applying restraints to minimize the possibility of injury.

DOCUMENTATION Staff shall document in writing all incidents involving the use of force. Staff shall also document in writing the use of restraints on an inmate who becomes violent or displays signs of imminent violence. A copy of the report shall be placed in the inmate's central file.

A report is to be prepared on the use of force. The report is to establish the identity of personnel and inmates involved and is to describe the details of the incident. The report is to be submitted to the Director or designee no later than conclusion of the tour of duty.

A report is not necessary for the general use of restraints, for example, in the routine movement or transfer of inmates. A report is necessary when restraints are used for other than general use. This report (to include mental health/medical reports) is to be submitted to the Director or designee no later than conclusion of the tour of duty. A copy of the report is to be placed in the inmate's central file.

 This order is not to supercede the Administrative Policy Statement of the Department of Corrections, number 1.13.03, effective date September 20, 1980, subject Use of Force, Ex. 7; it is supplemental thereto, excepting, where there may be conflict this order shall prevail. The Court reserves the right to the parties hereto to submit to the Court for its consideration a consolidated order with whatever modifications it deems appropriate, provided, however, said consolidated order is received within sixty days of the date of this order. It is suggested the parties confer and attempt a submission by agreement.[3]

So ordered.

---

**3.** Neither side has argued or briefed the issue of immunity. The strong public policy and concern of law enforcement personnel on this subject cause me to raise the question *sua sponte*.

This question has been thoroughly covered by the First Circuit Court of Appeals. Judge Bownes, speaking for the court, has analyzed the subject; it would be presumptuous of me to do anything more than quote at length from his opinion in *Floyd v. Farrell*, 765 F.2d 1 (1st Cir. 1985) at 4–5:

The general rule of qualified immunity, set out in *Harlow v. Fitzgerald*, 457 U.S. 800 [102 S.Ct. 2727, 73 L.Ed.2d 396] (1982), is that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818. [102 S.Ct. at 2738] This standard eliminates from consideration allegations about the official's subjective state of mind, such as bad faith or malicious intention, concentrating the inquiry upon the "objective reasonableness" of the official conduct. *Id.* Under this standard, the reasonableness of the official conduct is not measured against the official's *actual* knowledge of constitutional standards and the probable constitutionality of his or her action, but rather against a relatively uniform level of "presumptive knowledge" of constitutional standards. *Id.* at 815. [102 S.Ct. at 2736]

1. An exception is made where the defendant "claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard...." *Harlow*, 457 U.S. at 819. [102 S.Ct. at 2738] A concurring opinion by Justices Brennan, Marshall and Blackmun suggests that an official who "*actually knows* that he was violating the law ... (cannot) escape liability for his actions, even if he could not 'reasonably be expected' to know what he actually did know." *Id.* at 821 [102 S.Ct. at 2739] (Brennan, J. concurring). It may be that the Court did not mean to entirely eliminate from consideration actual "subjective" knowledge of constitutional standards, but this is not an issue in the case before us.

It certainly meets the level of "presumptive knowledge" that the infliction of physical pain or measures that are "incompatible with the evolving standards of decency that mark the progress of a maturing society" violate clearly established constitutional standards; such was the conduct here.