Leonard **CAMPBELL** et al., Plaintiffs,

v.

Anderson **McGRUDER** et al., Defendants.

Civ. A. No. 1462–71.

United States District Court, District of Columbia.

Nov. 5, 1975.

See also D.C., 416 F.Supp. 106.

J. Patrick Hickey, Public Defender Service, Washington, D. C., for plaintiffs.

Thomas R. Nedrich, Asst. Corp. Counsel, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

BRYANT, District Judge.

This case involves a class action brought by unconvicted pre-trial detainees incarcerated at the District of Columbia Jail in which plaintiffs seek a declaratory judgment that the conditions of their confinement violate their constitutional rights, and an order compelling defendants to discontinue the alleged violations. More specifically, plaintiffs contend that incarceration of pre-trial detainees at the District of Columbia Jail under conditions complained of constitutes cruel and unusual punishment as proscribed by the Eighth Amendment, and violates their rights to due process and equal protection of the law under the Fifth and Fourteenth Amendments.

The defendants are the Mayor of the District of Columbia, the Director of the Department of Corrections and the Superintendent of the District of Columbia Jail.

The basic portion of the Jail, including Cell Blocks 1 and 2, was built in 1872. In 1929 Cell Blocks 3 and 4 and the administration building were added. More recently Cell Block 4 was expended to a 4th tier. Cell Blocks 1 and 2 are maintained as maxi-

mum security units, while Cell Blocks 3 and 4 constitute the medium security facility. There are also two open dormitories, a 37-bed hospital, a library, a laundry and a culinary unit.

The normal operating capacity for the Jail is 663 inmates. This was determined by the Department of Corrections in 1973 by counting the then-available bedspace. On December 11, 1974 the population of the Jail was 988 inmates and at the time of trial, was nearing 1000.

Cell Blocks 1 and 2 are divided into east and west sides, each containing five tiers. The cells are 6 x 7 feet, 10 inches, and 9 feet high. The cells in Blocks 3 and 4 are about the same size, but are equipped with doors rather than bars. In addition, portions of the Jail are utilized for dormitory housing.

All the cells in Blocks 1 and 2 contain a toilet without toilet seat or lid and nothing partitioning it off from the rest of the cell, a sink with a cold water faucet, a small table and bench attached to the wall, and a bed—either single or bunk-bed style. Most of the cells in this part of the jail contain a bunk-bed (one bed over another) and house two persons. It is virtually impossible for two men to move around in the cell simultaneously without interfering with each other physically. In this regard there was testimony that inmates so housed adopted a system which allowed one inmate to move around the cell every other day while his cellmate stayed in bed. Twenty-two hours in such a cell constitutes a normal day for many of these inmates.

The dormitories are large rooms approximately 40 x 98 feet. At the time of the trial these rooms contained four rows of beds, two of which were of the double bunk type. Approximately eighteen inches separated the beds, and each dormitory housed from 125 to 150 men, all of whom keep their personal effects under their beds. There is also a toilet facility in each dormitory, walled off from the main room, but with no partitions between the commodes.

The dining facilities for Cell Blocks 1 and 2 are located on the ground floor and consist of approximately 20 small tables in each of the two areas. There is no partition between the cells and the dining area, and consequently toilets are in open view.

Cell Block 3 is known as the trustee facility, and Cell Block 4 houses juveniles and elderly persons. The cells in these two blocks have windows. From time to time, the cells in Block 4 contain two persons.

The Director of the Department of Corrections, Defendant Jackson, has the authority and responsibility to decide where sentenced inmates will be housed within the Department of Corrections complex, except in cases where the courts specifically designate a particular institution. A substantial number of sentenced persons are housed at the Jail. On March 10, 1975 there were 979 persons confined in the Jail. Examination of the records of 883 of these residents revealed that 20% (177) were sentenced convicts with no charges pending; 9.4% (83) were sentenced, but had charges pending; and 64% (565) were unsentenced. Fifty-eight sentenced persons were held pursuant to writs, parole violator warrants or orders of appellate courts.

The policy of the Department of Corrections at the time of trial, and for more than a year prior thereto, was to hold the following classes of sentenced prisoners at the Jail:

a) all misdemeanants serving sentences;

b) sentenced inmates from District Court awaiting designation of a Federal Bureau of Prisons institution for service of sentence, or awaiting transportation to such Federal institution after designation;

c) sentenced inmates from Superior Court where designation to a Federal Bureau of Prisons institution has been recommended by the sentencing judge, pending action on that recommendation and transportation to the institution;

d) inmates within three months of their parole eligibility date at time of sentence;

e) inmates within six months of their release date at time of sentence;

f) inmates on work release charged with violation of their work release conditions, pending review by the Work Release Review Board;

g) inmates charged with parole violations, pending their preliminary parole revocation hearing;

h) sentenced inmates for whom a court orders protection and/or separation from other inmates;

i) sentenced inmates whom the Department wishes to segregate from other residents at the Lorton Complex for protective reasons;

j) sentenced inmates assigned to the "Captain's Detail" (work crew) at the Jail;

k) inmates brought to the Jail pursuant to writs of habeas corpus *ad prosequendum* or *ad testificandum* ;

l) inmates sentenced under the Youth Corrections Act to evaluations pursuant to 18 U.S.C. § 5010(e), after completion of the evaluation and pending final imposition of sentence.

There is no segregation of sentenced from unsentenced residents at the District of Columbia Jail, except for unsentenced juveniles (ages 15 to 18) who are housed separately from the adult population.

There is no classification program at the Jail for determining the level of security needed for unsentenced residents, notwithstanding a Departmental Order (D.O. 4090.-1, dated November 19, 1973) requiring each superintendent to establish such a program. Consequently many unsentenced inmates who do not require maximum security are housed in the maximum security areas of the Jail under the most stringent living conditions. Only a small percentage of Jail residents (estimated by the Superintendent of the Jail as approximately 125 inmates) require maximum security housing.

Some inmates at the Jail are assigned to a work crew known as the Captain's Detail. These may be either sentenced or unsentenced prisoners. Approximately 180 inmates are on this work crew, and they perform various jobs, e. g. kitchen help, clerks, maintenance work, etc., for which they are paid small sums, ranging from $3 to $13.50 per month. They also enjoy substantial benefits in terms of housing and other privileges which are not made available to the general population. The reason for not making these privileges generally available to all residents is to encourage inmates to apply for and work on the Detail.

Those on the Detail are housed in CB–3, mostly in individual cells which have doors rather than bars, and also have a window. Also, these inmates receive one-hour social visits rather than the half-hour visits allowed to the rest of the population. In addition, inmates on Detail may receive their visitors across a table in the Rotunda, and may embrace and kiss their visitors on meeting. Inmates not on Detail are not allowed to touch their visitors, and conduct the visit by a telephone through a plexiglass barrier. There are also recreational benefits not afforded the rest of the population.

Numerous violations of the District of Columbia Building Code, Plumbing Code, Housing Regulations, Health Regulations, Food Regulations and Fire Code exist at the District of Columbia Jail. Inspections by the various Departments are few and far between. According to the evidence, uncontradicted and unimpeached, rats, mice and roaches are in abundance.

Although Departmental Order No. 4740.1 (October 28, 1971) requires a medical examination of food handlers at least twice a month, that regulation has not been complied with. No medical examinations of civilian employee food handlers at the Jail are conducted by the medical staff of the Department of Corrections, and medical examinations of the inmate food handlers have been conducted less than once a month over the past year.

The Department of Corrections has also violated its own regulations (D.O. 2910.1, dated August 11, 1969, and D.O. 2920.1, dated January 22, 1968) concerning fire safety inspections and procedures. Although written reports of inspections of fire

extinguishers at the Jail are required, no such written reports were made. At a recent serious fire in September 1974, several inmates were overcome by smoke, and more severe injuries were narrowly avoided, when fire extinguishers and other safety devices were not usable.

Many inmates at the jail display psychiatric symptoms. Some of these, designated for pretrial mental examinations, are committed to the District of Columbia Jail to await bedspace at St. Elizabeths Hospital. Others require psychiatric attention after returning from St. Elizabeths upon completion of examinations. In addition, some inmates who are not the subject of mental examination orders become psychiatric problems. From time to time sixty to seventy percent of the hospital beds available at the Jail are given over to psychiatric patients. The Jail medical staff does not include a psychiatrist, and the facility is not equipped to house, care for or treat psychiatric patients. Ordinary handcuffs and leg irons are used to shackle some severely disturbed inmates to their beds because appropriate restraining devices are unavailable.[1]

Laundry services for most Jail inmates are inadequate. Except for those housed in CB-3, inmates are responsible for washing their own underclothing, but the cells in CB-1 and CB-2 have no hot water.

Frequently old mattresses, not cleaned or sterilized and stained with urine and other excreta are issued to new detainees.

The quality of life for members of the class is substantially inferior to that enjoyed by convicted prisoners housed at other facilities of the District of Columbia Department of Corrections. Inmates at Lorton Correctional Complex, for example, including some with "maximum" security designations, live in dormitories much less crowded than those at the Jail. They also have contact visits with their friends and family, and recreational facilities are better. The differences in treatment between sentenced prisoners at Lorton and pre-trial detainees at the Jail are not attributable to the needs of security or custody, but are for the most part due to the overcrowding at the Jail and the Department's decisions on the allocation of resources.

During the course of this litigation defendants have never seriously contended that the matters complained of did not exist. Rather, their position has been that since the inception of the lawsuit matters over which they had control have been alleviated, and that as to the remaining complaints the defendants are helpless.

It is true that some shortcomings have been corrected, e. g. vermin have to a large degree been exterminated, some portions have been painted, and apparently much cleaning has taken place because the horrible stench described at the trial was not in evidence during an unannounced visit in late August of this year. Also the delivery of medical services has improved because of additional personnel and a realignment of the authority of the medical staff.

The defendants complain bitterly, and with what appears to be righteous indignation, that in these circumstances they have been accused of violating Eighth Amendment rights against cruel and unusual punishment. In support of the position that the cruel and unusual punishment charge is unfair, they seek much solace from the pronouncements of the Court in *Sostre v. McGinnis*, 442 F.2d 178 (2nd Cir. 1971), and suggest that the facts in that case are similar enough to this case for the holding therein to "give the Court wise guidance".[2] But then, in the very first six words of the description of Sostre, the defendants state: "Sostre was a New York *convict* . . ." (emphasis added).[3] Plaintiffs in this case are unconvicted pre-trial detainees held for

---

1. One inmate observed was reported to be commencing his third consecutive week under such restraint.

2. Defendants' Memorandum In Support Of Motion For Partial Summary Judgment.

3. Sostre was serving a 30–40 year sentence for selling narcotics.

the sole reason that they cannot meet the conditions set for their release pending trial.

Finding further the similarity between *Sostre* and the instant case, defendants point out his (Sostre's) "normal sized" cell was 6 x 8 feet—but the defendants do not point out that Sostre was not double housed in his cell.

■ It could be that the Eighth Amendment claim should not lie here because of its applicability only to convicted, sentenced persons. But as to the ultimate resolution of this case, *Sostre* offers little help. This Court measures the claims in this case by the standards utilized by the courts in such cases as *Rhem v. Malcolm*, 507 F.2d 333 (2nd Cir. 1974); *Brenneman v. Madigan*, 343 F.Supp. 128 (N.D.Cal.1972); *Jones v. Wittenburg*, 323 F.Supp. 93 and 330 F.Supp. 707 (N.D.Ohio 1971); *Hamilton v. Love*, 328 F.Supp. 1182 (E.D.Ark.1971). The Court in *Rhem, supra*, put it succinctly and in precise terms:

> "The demands of equal protection of the law and of due process prohibit depriving pre-trial detainees of rights of other citizens to a greater extent than necessary to assure appearance at trial and security of the jail; and the same constitutional provisions prevent unjustifiable confinement of detainees under worse conditions than convicted prisoners . . . a detainee is entitled to protection from cruel and unusual punishment as a matter of due process, and, where relevant, equal protection."

*Sostre, supra*, was an en banc decision by the Second Circuit in 1971. Over three years later a panel decision of the same Circuit (two members of which participated in *Sostre* ), decided *Rhem*, without ever mentioning *Sostre*. This latter case is indeed more similar in every respect to the instant case, and this Court relies heavily upon it for the wise guidance suggested by defendants.

Accordingly, the Court concludes that the conditions already described are constitutionally impermissible insofar as they apply to the plaintiff class, and should be discontinued.

■ By far the most flagrant and shocking encroachment on the constitutional rights of the plaintiff class is the overcrowding; and an order which directed cessation of this specific condition has already been entered. It is currently the subject of a remand procedure which the Court seeks to implement in a separate memorandum.

Relative to the remaining conditions to be remedied the Court orders that the defendants shall:

1) Direct the D. C. Fire Department, the D. C. Department of Inspections and Licenses, and the D. C. Environmental Health Administration to inspect the Jail no later than November 15, 1975 to determine violations of the D. C. Fire Code, Building Code, Housing Regulations, Health Regulations, and Food Regulations. In each case, inspections will be conducted in accordance with the same standards, procedures, and evaluation methods as are used in inspecting any other building in the District of Columbia. Within ten (10) days of these inspections, the inspectors will prepare and submit to this Court and to counsel for the parties written reports of their inspections, including lists of code violations or other unsafe or unsanitary conditions, together with recommendations for remedial action. Within thirty (30) days of these inspections defendants shall report to the Court the action taken on each deficiency.

2) Provide clean clothing (including underwear) to all residents of the D. C. Jail and clean bed linen and towels at least once a week.

3) Provide at least one hour of out-door recreation daily for each resident of the Jail.

4) Establish a classification system which will make it possible to determine a) which inmates of plaintiff class require maximum security confinement; and b) which members of class can enjoy contact visits without jeopardizing the security of the facility.

5) Provide medical examinations of all food handlers, inmate and civilian employ-

**106**

ees, at the Jail at least once every thirty (30) days and more often if medically required.

6) Establish the following procedures at the Jail: In the event an inmate displays unusual behavior suggestive of possible mental illness, such behavior shall be immediately reported to the medical staff. The inmate will be seen by a psychiatrist within twenty-four (24) hours. If the inmate is found to be mentally ill, he will be transferred within forty-eight (48) hours of such finding to a hospital having appropriate facilities for the care and treatment of the mentally ill; and

7) Establish the following procedures governing use of restraints:

a) inmates requiring restraints will be housed only in a hospital setting, and not with the general population;

b) unpadded handcuffs and leg irons shall not be used under any circumstances. Medically appropriate restraints, padded or pliable to prevent injury to the inmate, may be utilized;

c) restraints may be imposed only on the specific written authorization of a medical doctor;

d) if required in an emergency situation when a doctor is present, a Medical Technical Assistant (MTA) or a Registered Nurse may order the temporary use of restraints, subject to the receipt, by telephone or otherwise, of approval from a medical doctor within two (2) hours of the imposition of such restraints;

e) a log will be kept reflecting the use of restraints, and stating for each such use the name of the person restrained, the date and time he was placed in restraints, the name of the doctor approving the use of restraints, and the time of such approval;

f) orders by a doctor authorizing the use of restraints are valid for twenty-four (24) hours only, and if no further written order has been entered within that period, the inmate shall be released from restraints;

g) no restrained inmate shall be housed in such a manner as to permit access to him by non-restrained inmates, with the exception of inmates approved by the medical staff for employment in the hospital area.

It is further ordered that this Court retains jurisdiction for the purpose of implementation of this ORDER.