Donyell A. MARSH, et al., Plaintiffs,

v.

Marion S. BARRY, et al., Defendants.

Ricky BROGSDALE, et al., Plaintiffs,

v.

Marion S. BARRY, et al., Defendants.

Civ. A. Nos. 84–2249(HHG),
84–2251(HHG).

United States District Court,
District of Columbia.

Dec. 23, 1988.

Catherine A. Brown, Washington, D.C., for plaintiffs.

Harry Toussaint Alexander, Jr., Asst. Corp. Counsel, Correctional Litigation Section, Washington, D.C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

The federal courts in this jurisdiction have had to deal for some time now with litigation of various kinds regarding conditions in the District of Columbia's correctional institutions. Much of that litigation has revolved around overcrowding and the conditions that accompany overcrowded institutions. In spite of an alarming rise in serious crime, increasing terms of imprisonment mandated legislatively or imposed judicially, more energetic police work, and a judicial and prosecutorial system working at greater speed—all of which made it obvious that increasing numbers of criminals would be incarcerated—little was done to provide the necessary confinement space, not even in response to repeated court decrees. As a consequence, overcrowding has become constantly worse, to the point where now District of Columbia convicts are being shipped thousands of miles away to state institutions the adequacy of which no one can assess.

This multifaceted problem is now assuming a new dimension. As described below, the overcrowded conditions at the D.C. Jail caused a riot and a fire to break out at that institution. This Opinion considers the question whether inmates who claim to have been injured as a result of these calamities may sue the District government as well as its mayor, its chief of corrections, and other policymakers in their official and their personal capacities for damages under the civil rights laws.

I

*Background*

On July 22, 1983, a fire was started by several inmates in the Southwest housing unit of the District of Columbia Detention Center (hereinafter referred to as the D.C. Jail or the jail). Although the inmates were eventually evacuated from the unit, a number of them were injured in the course of the fire and the panic that ensued. Seventeen inmates brought this action against the District of Columbia government and a number of its officials and employees pursuant to various civil rights statutes, 42 U.S.C. §§ 1983, 1985, and 1986.[1]

It is plaintiffs' contention that on the relevant date the jail was so overcrowded in violation of the Constitution and several court orders,[2] that the resulting frustration

---

1. Plaintiffs may sue the D.C. government and its various employees in their official capacities under *Monell v. N.Y. City Dept. of Social Services,* 436 U.S. 658, 690–94, 98 S.Ct. 2018, 2035–37, 56 L.Ed.2d 611 (1977), because, as Judge Bryant made clear in his opinion holding numerous D.C. officials in contempt for their failure to obey his orders involving overcrowding at the D.C. Jail, what is at issue is the policy, practice or custom of the District of Columbia to maintain the jail in an unconstitutionally overcrowded condition. *Campbell v. McGruder,* Memorandum Opinion (September 30, 1983) (*see especially* pp. 5–14, 20–23, 24).

2. *See Campbell v. McGruder,* 416 F.Supp. 100, 111 (D.D.C.1975), *aff'd,* 580 F.2d 521, 536–40 (D.C.Cir.1978), and subsequent opinions and or-

caused a number of other inmates (that is, inmates not parties to this lawsuit) to set the fire that injured these plaintiffs. The overcrowding, it is claimed, was a consequence of defendants' wanton and willful failure to act, and it follows that the defendants are responsible for the proximate and foreseeable consequence of their decision to maintain overcrowding at the jail—the fire and the injuries from the fire. In addition, the complaint alleges that various acts and omissions of both the District's policymaking officials and the correctional officers during the hours immediately following the fire independently violated plaintiffs' constitutional rights, causing them further injury.

On June 4, 1986, this Court granted summary judgment in favor of the defendants. On the independent activities claim, the Court held that the actions taken by the correctional officials during and after the fire were reasonable under the circumstances. With respect to the overcrowding issue, the Court held that, although the jail was illegally overcrowded, plaintiffs could not establish as a matter of law that their injuries were caused by that overcrowding. This was so, in the view of this Court, because those responsible for the overcrowding could not reasonably be charged with foreseeing the fire, inasmuch as a fire set by inmates to their own institution is a self-destructive intervening criminal act which could not be foreseen and which breaks the chain of causation between the original tort and the injuries.

On appeal, the Court of Appeals affirmed this Court's decision as to the acts of correctional officials during and after the fire.

However, that court reversed and remanded on the question whether the injuries were proximately caused by the overcrowding. In this regard, the appellate court relied heavily upon the testimony of George Holland, Assistant Director of the Department of Corrections, who had stated during the *Campbell* contempt hearings *supra* note 1, that he expected rioting to occur at the jail because of the overcrowded conditions.[3] Reasoning that, since such rioting had actually been foreseen, it could certainly be concluded that it was foreseeable.

The significance of that appellate determination is plain: if the rioting was foreseeable, those in control of the institution should have taken steps to avoid that hazard, and the chain of causation between the original illegal overcrowding of the prison and the riot that ultimately occurred was not broken despite the activities of the inmates themselves.[4]

With respect to the fire, the Court of Appeals contemplated an additional step: this Court is to determine whether the fire was part of the riot (as distinguished from being an isolated criminal act). If the answer to that question is found to be in the affirmative, then the fire would likewise have to be regarded as foreseeable.[5]

Finally, the Court of Appeals decision requires this Court to determine whether the general disturbance, including both the riot and the fire, "was directly or indirectly caused by the illegal overcrowding at the Jail." 824 F.2d 1139, 1145 (1987).

---

ders issued by Judge William Bryant. *See also,* note 24, *infra.*

**3.** Holland's testimony was as follows:
The Court: Are you approaching the danger point at the Jail?
Holland: I believe that when we begin to have double-celling and also repopulate the open area, that is approaching the danger point....
The Court: When you say danger point, what are we talking about?
Holland: Danger point just means that you know out of your experience that when you crowd that tempers are going to flare ... at each other and ... at staff.

The Court: ... In ordinary language, we are talking about rioting?
Holland: I think you could say that, Your Honor.
*Campbell v. McGruder,* No. 1462–71, slip op. at 20–21 (June 27, 1983); App. at 198–99.

**4.** *See also, St. Paul Fire & Marine Ins. Co. v. James G. Davis Construction Corp.,* 350 A.2d 751, 752 (D.C.App.1976).

**5.** If the fire was foreseeable, it could not be regarded as breaking the chain of causation between the actions or omissions of the defendants and the fire-related injuries suffered by the plaintiffs.

Pursuant to the remand, the case is now once again before this Court on several potentially dispositive motions. Presently pending are (1) defendants' motion to dismiss the complaint as to Thomas. Gaydos, Aaron Chambers, John Evans, Luther Cary, Zachary Lynch, and Amos Best; (2) defendants' motion for summary judgment as to the entire case; and (3) plaintiffs' motion for partial summary judgment on the issue of liability. The Court will consider first the simplest issue—the motion to dismiss the complaint as to the individual correctional officers listed above.

## II

### *Motion to Dismiss As To The Correctional Officers*

Thomas Gaydos, Aaron Chambers, John Evans, Luther Cary, Zachary Lynch, and Amos Best are, or were at the time of the fire, correctional officers at the D.C. Jail. To the extent that the allegations against these defendants involve conduct during and after the fire, the complaint has already been dismissed. This Court previously held that the behavior of the correctional officers during and after the fire was fully reasonable in light of the circumstances. That decision applied both to prison officials and to "correction officers on the scene," and it was affirmed by the Court of Appeals. Hence that issue is settled. The only question, therefore, is whether notwithstanding that dismissal, any legitimate complaint remains against these officers.

Plaintiffs contend that significant allegations are still alive. However, almost every one of the allegations cited by plaintiffs involves conduct during and after the fire.[6] The Court will not permit a regurgitation of issues that have been decided.

██ The only remaining allegation that could even arguably involve the correctional officers is that in paragraph 90 of the complaint which states that the fire was a consequence of "the joint decision of all defendants to maintain the District of Columbia Jail in such a manner as to constitute a constant threat to plaintiffs' safety." Notwithstanding that broad and conclusory claim, plaintiffs now agree, as they must, that the correctional officers at the jail are not policymakers.[7] These officers, also known as guards, have no role in decision-making as to how the jail should be maintained. Indeed, the decision in which they are alleged to have participated—to maintain the jail in such a manner as to constitute a threat to the inmates; *i.e.,* to allow conditions conducive to the outbreak of a riot—would have been manifestly contrary to their own interests. The claim in paragraph 90 is frivolous, and summary judgment is appropriate with respect to it as well.

Finally, plaintiffs contend that dismissal or summary judgment is not appropriate with respect to their section 1985 and 1986 claims against the correctional officers. These claims, however, are in turn based on the section 1983 claims, all of which have already been dismissed or are now being dismissed as to the officers. The section 1985 claim asserts that:

> By acting together and in concert to *formulate policies,* whether official or informal, that caused plaintiffs' injuries as described above, defendants conspired to deprive plaintiffs, as members of a class of incarcerated persons, of equal privileges and immunities under the law, namely, their Fifth and Eighth Amendment rights, in violation of 42 U.S.C. § 1985(3) (emphasis added).

As discussed above, the activities of the correctional officers during and after the fire not only have been held to be reasonable as a matter of law; the policies upon which their activities may have been based, including any policy of overcrowding—the only policy still at issue in this case—were not formulated by these officers but by

---

6. Paragraph 66, for example, alleges that Chambers, Best and Lynch "failed to take immediate steps to extinguish the fire and provide plaintiffs with access to safety." Paragraph 89, also cited by plaintiffs, refers to "the deliberate failure of defendants Chambers and Best to prevent or stop the fire."

7. Oral Argument on Motions for Summary Judgment, December 5, 1988.

others higher-up on the bureaucratic ladder. This claim must therefore also be dismissed as to these defendants.

Similarly, the section 1986 claim alleges that "[b]y neglecting to prevent or to attempt to prevent the violations of plaintiffs' Fifth and Eighth Amendment rights as described above, defendants violated 42 U.S.C. § 1986." Again, no violations occurred during or after the fire, the times during which the correctional officers were involved. And as mere guards in the D.C. Jail, these defendants were indisputably powerless to take or to prevent the kinds of decisions at issue in this case. It is clear, then, as this Court stated in its first Opinion, that since no section 1983 claims remain, the section 1985 and 1986 claims must fail as well.[8]

## III

### *The Fire And Riot*

Plaintiffs have moved for partial summary judgment on the issue of liability, claiming that there are no genuine factual disputes on the following propositions: the riot was foreseeable; the fire was part of that general riot and accordingly it was also foreseeable; and the riot and fire were both proximately caused by overcrowding at the jail. Thus they purport to answer precisely all the questions raised by the Court of Appeals in remanding this case. The Court will consider each of these questions separately.

■ The first issue is whether the riot was both foreseen and foreseeable. Based on the guidelines mandated by the Court of Appeals and the evidence in the record, the answer must clearly be in the affirmative.

According to section 1122(a) of Title 22 of the District of Columbia Code, a riot is a

> public disturbance involving an assemblage of 5 or more persons which by tumultuous and violent conduct or the threat thereof creates grave danger of damage or injury to property or persons.[9]

The uncontroverted evidence contained in defendants' own exhibits demonstrates that, at the time of the fire, a dangerous disturbance was in progress in the jail's Southwest Unit involving more than five persons. For example, defendants' Exhibit 1, a memorandum from correctional officer Aaron Chambers, states that after the inmates were informed that their canteens [10] would be a day late "the entire unit went into an uproar...." [11] Approximately seven minutes later, an inmate named Gilbert Sylvester began throwing chairs at the guards' station. At that point, according to a report by Chambers to the Command Center, the inmates

> were turning over beds and banging on the bubble with parts from the beds. Then [he] noticed inmate Kenneth Ward ... running in the dining room with a pipe and also other residents, but because of the smoke and the confusion you really couldn't tell who was involved in the unit.[12]

This account is supported by that of Correctional Officer Amos Best which states that

> At about 3:10 p.m., July 22, 1983, information was received ... that inmates in SW-2 were setting fires and refusing to return to their cells as directed. A couple of minutes later, this developed into a situation classified as a Disturbance as the Inmates became rebellious in that they were setting huge fires with mat-

---

8. The Court of Appeals did not reach this issue. It simply held that since the section 1983 claims were not all dismissed, the section 1985 and 1986 claims should be reinstated for further consideration by this Court. *Marsh v. Barry,* 824 F.2d 1139, 1145 n. 12 (D.C.Cir.1987).

9. D.C.Code § 22-1122(a), cited in the motion of defendants for summary judgment and opposition to plaintiff's motion for partial summary judgment upon the issue of liability (July 6, 1988).

10. Canteens are the packages of cigarettes, candy, and other items that are delivered to the inmates on a regular basis.

11. Memorandum from Correctional Officer Aaron Chambers to Captain Ivan Anderson dated July 22, 1983 (Defendant's Exhibit 1).

12. *Id.*

tresses, throwing things, yelling and other forms of disobedience.[13]

To be sure, the deposition of William White, an inmate, submitted as Defendants' Exhibit 6, states that a full-fledged riot did not materialize. But White himself acknowledged that almost all the inmates had armed themselves with pipes and were ready to fight the guards.[14] This suggests at a minimum the "threat of violent conduct," in the words of section 1122 of the Code.

The Court concludes that the evidence submitted by the defendants themselves supports plaintiffs' assertion that this was precisely the kind of riot or general disturbance forecast by George Holland in his testimony before Judge Bryant in the *Campbell* case. There is no genuine issue on the question whether a general disturbance or riot occurred at the jail on July 22, 1983.[15]

The Court of Appeals has prescribed the next step—an inquiry whether the fire that day was a part of the riot. Again, to hold or even seriously to consider that the fire was independent of the riot would be to misread completely what occurred at the D.C. Jail on July 22, 1983, for the evidence submitted by the defendants themselves plainly compels an affirmative answer. A fire started in the Southwest Unit of the jail five minutes after the uproar reported by correctional officer Chambers which marked the beginning of the riot, and two minutes before Sylvester began throwing chairs at the guards' station—in short, the fire was at the very center of the riotous conduct. Moreover, as related above, in the course of the riot or disturbance there was so much smoke that it was difficult to determine who was involved, and inmates were at the very time "setting huge fires." The conclusion is inescapable that the fire was part of the riot.

Under the law as laid down by the Court of Appeals, since the fire was an integral part of the riot, it must be regarded as equally foreseeable as that riot. Contrary to its decision of June 1986, this Court is therefore now compelled to conclude that the fire should have been anticipated and protected against by the defendants, that it was not an independent event, and that it did not break the chain of causation.[16] To put it another way, it is now settled as a matter of law, as the law has been explained by the Court of Appeals, that if the riot was not unexpected but caused by the illegal overcrowding, then the fire itself was likewise not an unanticipated event exonerating the correctional officials, but rather a consequence of their wrongdoing.

## IV

### Overcrowding And The Riot

The Court must therefore now turn to the last question posed by the Court of Appeals—"whether [the] general disturbance was directly or indirectly caused by the illegal overcrowding at the Jail." 824 F.2d at 1145. In this respect, the Court is

13. Memorandum from Correctional Officer Amos Best to Captain John Evans, Shift No. Three Supervisor, dated July 23, 1983 (Defendant's Exhibit 2).

14. The transcript of a taped interview with inmate William White at 3 (Defendants' Exhibit 6), reads as follows:

Interviewer: Approximately how many residents was [sic] armed with weapons? Just about everybody in the block?
White: Just about everybody. You know it was enough beds in there; if you go around there and count the beds that's torn down. Them little separate pipes you see I bet, you know how many people have them.

15. In fact, the question of whether or not there was a riot only arose in connection with the decision of the Court of Appeals. Prior to that time, it was acknowledged by all involved that a riot as well as a fire occurred at the D.C. Jail on July 22, 1983. *See, e.g.,* Complaint at 17, 19, 21; defendants' memorandum in support of motion for summary judgment at 1, App. at 89. Even Judge Bryant in his order finding D.C. corrections officials in contempt just two months after the fire stated as a matter of fact that a riot occurred at the jail on July 22, 1983. Memorandum Opinion at 1 (September 30, 1983). While, as the Court of Appeals noted, prior statements of the parties are not dispositive, they are at least some indication that a riot did occur.

16. *See Romero v. National Rifle Association,* 749 F.2d 77, 79 (D.C.Cir.1984).

confronted, as an initial matter, with language in the Court of Appeals opinion itself that in a sense answers the question. That court said:

> ... Rioting ... is among the chief evils one fears will result from overcrowding in a prison—as both common sense and the testimony of an appellee prison official suggest.[17]

Moreover, George Holland, the prison official referred to by the appellate court, has said that

> [y]ou know out of your experience that when you crowd that you can expect that tempers are going to flare. When those tempers flare, they flare at each other, and they flare at staff.[18]

All this suggests that overcrowding, when it exists, may be regarded as at least an indirect cause of all riots that occur in overcrowded institutions. It is the overcrowding, we are told, that makes tempers flare, and even if the actual catalyst for the riot is a discrete event, such as a disagreement among inmates, it would be impossible to say that, where a general disturbance occurs, the overcrowding was not a proximate cause of the anger and the rioting.

█ Fortunately, while such a result may conceivably be called for by the Court of Appeals language quoted above, it is not necessary to go that far in this case. There is uncontradicted evidence in the record—again in defendants' own exhibits—to compel the conclusion that overcrowding was the actual catalyst for the riot and the fire.

In his letter forwarding the various reports from the guards on duty during the fire, William Long, Assistant Administrator of the Department of Corrections, summarizes the results of the investigation performed immediately after the fire. This high level official attributes the fire and riot directly to the overcrowding:

> Following this announcement [of the delay in canteen delivery] it appears some of the inmates used this as a catalyst *for acting out against confinement and related perception of overcrowding and poor service delivery* (emphasis added).[19]

No one has contradicted the assessment made by this official who conducted the post-mortem of the events of July 22, 1983 on behalf of the District of Columbia government. Indeed, it is not apparent to this Court what other evidence could be offered by either side as to the issue of causation, short of the predictable parade of inmates testifying that they threw chairs and burned mattresses because they were angry about overcrowding.

Thus, there can be no question but that the overcrowding at the jail was at least an indirect, and probably the direct cause of the riot and the fire. Since the Court of Appeals has determined that the riot was foreseeable and therefore did not break the chain of causation, the defendants are liable for the injuries that occurred in the course of the riot and the fire, and plaintiffs are entitled to partial summary judgment as to liability.[20] It remains only to determine the extent of those injuries, and the Court will hold a trial on that issue.

## V

### Conclusion

This Court believes that judicially-imposed population ceilings are superior to damages actions as remedies for prison overcrowding.[21] In the first place, such ceilings are imposed only when the overcrowding assumes proportions that violate

---

17. 824 F.2d at 1145. By contrast, said the Court of Appeals, "[t]he underlying rate of ... random acts of violence may rise with overcrowding, to be sure, but it would still be the unusual case in which a specific act could be attributed to the effects of overcrowding...."

18. *See* note 3, *supra*.

19. Memorandum dated July 27, 1988, from William Long, Assistant Administrator, to George Holland, Assistant Director (Defendant's Exhibit 5).

20. For the same reasons, defendants' motion for summary judgment will be denied.

21. *See generally, Inmates of Occoquan v. Barry*, 844 F.2d 828, 844, 853 (D.C.Cir.1988) (Greene, J., dissenting).

the Constitution's Eighth Amendment;[22] damages, by contrast, may be awarded whether or not the overcrowding is unconstitutional as long as the inmates are legitimately but nevertheless subjectively frustrated by the crowded conditions. Moreover, damages actions lend themselves to sham and fraud, for by their very nature they permit one inmate or group of inmates to blame another for any disturbance that may have resulted, and they open the door to verdicts based on evidence that is difficult to verify and hence is susceptible to gross manipulation. Next, at least in theory, it may be unseemly to hold policymakers far from the scene personally liable for inmate boiling points based upon internal dynamics over which they have relatively little control. Finally, in light of the dangerously overcrowded conditions that exist in all of the D.C. detention facilities, this Court is most reluctant to send the message to the inmates of those facilities that damages may flow to those who riot (or at least to their fellow inmates).

All that having been said, a damages action is appropriate here notwithstanding these problems. This is so not only because the Court of Appeals has mandated the use of section 1983 here, but for two other significant policy considerations.

First, as a practical matter, the Court of Appeals may have interred the remedy of population ceilings in this jurisdiction, *Inmates of Occoquan v. Barry, supra,*[23] and if there is to be any remedy for shocking prison conditions, it must therefore come by way of a damages action. Second, the remedy of court orders to reduce or eliminate overcrowding has been tried, and tried again in the District of Columbia, but those responsible for correctional policy have managed for many years now to avoid, evade, or violate those orders.[24] Thus, if the conditions in the District's correctional institutions, including the D.C. Jail, are to be remedied or ameliorated, the responsible policymakers will have to feel their neglect in their pocketbooks.[25]

It is an ironic as well as a tragic commentary on governmental paralysis in the face of conflicting political pressures[26] that the

---

**22.** It so happens that Judge Bryant of this Court has concluded that the overcrowding at the jail violates the Eighth Amendment, *Campbell v. McGruder,* 416 F.Supp. 100, 111 (D.D.C.1975), and the Court of Appeals upheld his findings specifically as to pretrial detainees. *Campbell v. McGruder, supra,* 580 F.2d at 532–40. Not all of the plaintiffs in this case were pretrial detainees, and it is not clear whether under the test set forth in *Inmates of Occoquan v. Barry, supra,* the facility was sufficiently overcrowded to violate the constitutional rights of permanent prisoners. In any event, the constitutionality or unconstitutionality of the overcrowding would appear not to be critical to the causation and foreseeability issues which are central to this damages lawsuit.

**23.** In that case, the court did not entirely outlaw population ceilings; but it so hedged in that remedy that it could not readily be applied to District of Columbia penal institutions.

**24.** In 1975, Judge Bryant first found that overcrowding at the D.C. Jail was a "flagrant and shocking" constitutional violation. *Campbell v. McGruder, supra,* 416 F.Supp. at 105. As indicated, this decision was upheld by the Court of Appeals in 1978. The District of Columbia government and its Department of Corrections were thereafter repeatedly ordered to improve the conditions and to comply with the court orders, but they repeatedly ignored these orders

and even concealed their violations. The depressing history of that case is described in Judge Bryant's opinion holding D.C. officials in contempt. Memorandum Opinion of September 30, 1983, at 2–11. After years of all this legal maneuvering, the predicted riot occurred.

Since that time, the governmental authorities, as before, have issued plans and proposals for addressing overcrowding in the District of Columbia correctional facilities, but again as before, there has been no tangible progress. In fact, both the overcrowding and the litigation continue to this day, both at an accelerated pace. *See, e.g., Campbell v. McGruder,* Civil Action No. 71–1462, Memorandum and Order (July 15, 1985); Oral Order (September 29, 1988); *Twelve John Does v. District of Columbia,* Civil Action No. 80–2136 (D.D.C. August 1, 1988) [1988 WL 83163]; *United States v. District of Columbia,* 703 F.Supp. 982 (D.D.C.1988).

**25.** There are seventeen plaintiffs in this case, all of whom plan to submit medical records as to the extent of their injuries. The complaint seeks $500,000 in compensatory damages and $250,000 in punitive damages for each plaintiff, for a total of over $12 million.

**26.** The public demands severe punishment for criminal violators and is quick to be critical of any governmental leader or politician who does

most effective way for inmates to obtain some kind of relief for the conditions in which they are detained is to be caught in a riot that endangers the lives of many of them. Yet the history of this case and related litigation unfortunately suggests that this may not only turn out to be the actual result, but also the only feasible method of ensuring civilized, adequate detention facilities.

---

not act to provide the kind of law enforcement that results in such punishment. Yet the same public is reluctant at best to support the taxes that are necessary to construct the required penal facilities, and it harshly denounces any government official who proposes that such fa-

cilities be built in any neighborhood but one that is entirely deserted—a condition that does not exist in urban areas.