Ricky **BROGSDALE**, et al., Appellees,

v.

Marion S. **BARRY**, Jr., et al.,
Appellants.

Donyell A. **MARSH**, et al., Appellees,

v.

Marion S. **BARRY**, Jr., et al.,
Appellants.

Nos. 89–7214, 89–7215.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 11, 1991.

Decided Feb. 26, 1991.

As Amended March 12, 1991.

Edward E. Schwab, Asst. Corp. Counsel, District of Columbia, with whom Herbert O. Reid, Sr., Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, were on the brief, Washington, D.C., for appellants in 89–7214 and 89–7215.

Robert J. Flynn, Jr., with whom Catherine A. Brown was on the brief, Washing-

ton, D.C., for appellees in 89–7214 and in 89–7215.

Before EDWARDS, THOMAS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

The question presented in this appeal is whether three officials of the District of Columbia Government can be held personally liable for injuries suffered by inmates during the course of a prison riot. The District Court granted summary judgment in favor of the plaintiff-inmates, finding that the riot and a related cell-block fire were foreseeable consequences of unconstitutional overcrowding at the facility and that the defendant-officials had exceeded the scope of their qualified immunity in deliberately failing to avert the dangerous conditions. We reverse because we find that the defendants' conduct was protected by qualified immunity.

### I. BACKGROUND

On the afternoon of July 22, 1983, inmates at the District of Columbia's Central Detention Facility ("D.C. Jail" or "Jail") staged a small riot, allegedly to protest prison conditions. During the course of the riot, some inmates set a fire inside a cell block, the result of which was that a number of inmates were injured before prison authorities could safely evacuate the area. The appellees in this case, plaintiffs below, were 17 inmates injured by the fire. Eight of the plaintiffs were pretrial detainees at the time of the incident, and the remaining nine were convicts serving sentences.

The plaintiffs brought suit in District Court against the District of Columbia, the Mayor and two top corrections officials, alleging that the riot and fire were caused by unconstitutional overcrowding at the D.C. Jail, and that the defendant-officials violated 42 U.S.C. §§ 1983, 1985 and 1986 (1988) by failing to prevent the foreseeable melee.[1]

This law suit follows in a continuing series of court cases challenging living conditions inside the District's correctional facilities. During the 1970s, unconstitutional conditions were found to exist at the District's old jail facility. *See Inmates, D.C. Jail v. Jackson*, 416 F.Supp. 119, 122–23 (D.D.C.1976); *Campbell v. McGruder*, 416 F.Supp. 100, 105 (D.D.C.1975), *aff'd in part*, 580 F.2d 521, 538–40 (D.C.Cir.1978). Even after the old jail was torn down and replaced by a new one—the Central Detention Facility at issue in this case—there were renewed judicial findings that the Jail was dangerously, if not unconstitutionally, overcrowded. In 1982, as part of its continuous monitoring of conditions inside the D.C. Jail, the District Court agreed to permit "double-celling" of some pretrial detainees, but it set out certain conditions, including time limits and recordkeeping obligations, that it considered essential to ensuring the constitutionality of the practice. *See Campbell v. McGruder*, 554 F.Supp. 562, 565 (D.D.C.1982). Several months later, in September 1983, the District Court held three D.C. Government officials—the same individual defendants involved in the instant action—in contempt for breaching some of the conditions specified in the order, namely, "double-celling" pretrial detainees for longer periods than permitted in the order and failing to maintain mandated jailhouse records. *See Campbell v. McGruder*, Civ.Action No. 1462–71 (D.D.C. Sept. 30, 1983). It was in the midst of this litigation, in July 1983, that the riot and fire occurred that gave rise to the instant law suit.

1. The plaintiffs also included several pendent common-law tort claims in their amended complaint but the District Court did not advert to these in its most recent ruling. Because the trial court did not purport to rule on any of these claims, and because no issue concerning them has been brought before this court, we have no occasion to address them. We note, however, that should any of these claims survive, it is doubtful that they would fare any better than the federal claims under the applicable common-law immunity standard. *See District of Columbia v. Thompson*, 570 A.2d 277, 295–97 (D.C.), *reh'g granted*, 580 A.2d 144 (D.C. 1990).

In 1986, when this case first came to trial, the District Court granted summary judgment in favor of the defendants, holding that the plaintiffs could not show that their fire-related injuries were proximately caused by the defendants' conduct in fostering overcrowding; simply put, the trial judge found that "such a wantonly self-destructive act was unfor[e]seeable as a matter of law." *See Marsh v. Barry*, 824 F.2d 1139, 1142 (D.C.Cir.1987) (per curiam) (this court's discussion of the District Court's reasoning). On appeal, it was held that the riot was not only a foreseeable consequence of mounting overcrowding at the Jail but that, in fact, it had been foreseen in this case by at least one D.C. prison official. *Id.* at 1144. The District Court's judgment was thus reversed and the case was remanded for a determination of whether the fire was actually related to the simultaneous rioting and whether that riot was in fact caused by illegal overcrowding at the Jail. *Id.* at 1145.[2]

On remand, the trial court found that the fire was indeed part and parcel of the riot and that both were caused by the overcrowded conditions at the Jail. *See Marsh v. Barry*, 705 F.Supp. 12, 17–18 (D.D.C. 1988). Based on these findings, the trial court granted partial summary judgment in favor of the plaintiffs on the question of liability under 42 U.S.C. § 1983 and scheduled a trial to determine the extent of damages. Following judgment, the defendants asked the court to amend its judgment to the extent that it found the defen-

dant-officials liable in their personal as well as official capacities. The court, however, rejected this motion, ruling that the officials had exceeded the scope of their qualified immunity by defying court orders related to overcrowding at the Jail. *See Brogsdale v. Barry*, Civ.Action No. 84–2251, mem. op. at 7–8 (D.D.C. Aug. 2, 1989).

The defendant-officials now appeal that ruling, arguing that their decisions concerning prison administration fell within the scope of their qualified immunity. We agree and therefore reverse the District Court's judgment.

## II. ANALYSIS

### A. *Constitutional Injury*

■■■ To support liability under 42 U.S.C. § 1983, it was necessary for the District Court to find that the defendants violated some right of the plaintiffs secured by federal statute or the Constitution.[3] Here, the plaintiffs attributed the defendants' liability to their conduct in permitting prison overcrowding in violation of the plaintiffs' rights under the Constitution. The foundation of the constitutional right is different for the two classes of plaintiffs: the *pretrial detainees* must rely upon the Fifth Amendment's guarantee of due process, whereas the *convicted plaintiffs* must ground their claims upon the Eighth Amendment's ban on cruel and unusual punishment.[4] In either case, we

---

**2.** The question of the defendants' asserted qualified immunity was neither presented to nor considered by the court during the first appeal of this case.

**3.** Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

42 U.S.C. § 1983 (1988). The Supreme Court recently reiterated the appropriate framework for evaluating section 1983 claims:

A determination that § 1983 is available to remedy a statutory or constitutional violation involves a two-step inquiry. *First, the plaintiff*

*must assert the violation of a federal right....* Second, even when the plaintiff has asserted a federal right, the defendant may show that Congress "specifically foreclosed a remedy under § 1983," by providing a "comprehensive enforcement mechanis[m] for protection of a federal right."

*Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989) (citations omitted; emphasis added).

**4.** In each case, the conditions constituting the constitutional violation may be essentially the same—overcrowding that makes prison life unsafe and indecent—although the threshold for establishing a constitutional violation is clearly lower for the pretrial detainees. For the latter group, not yet convicted of any crime, the question is whether prison conditions "amount to punishment of the detainee." *Bell v. Wolfish,*

have no pause in agreeing that, under recent case law, prison overcrowding may violate the Constitution where it is so egregious that it endangers the safety of inmates. *See Morgan v. District of Columbia,* 824 F.2d 1049, 1056–58, 1061 (D.C.Cir. 1987). Nor do we doubt that the facts presented in the case before us, read in view of currently applicable constitutional principles and in a light most favorable to the appellees, arguably might support a finding that the defendants fostered unconstitutional overcrowding at the D.C. Jail and that they could be held liable for any damages that proximately flow from that constitutional violation. Indeed, in *Morgan,* this court refused to overturn a jury verdict assigning official liability under section 1983 to the District of Columbia for inmate violence attributed to overcrowding at the very same jail only one month before the violent outburst at issue here. *See id.*[5]

■ With this said, however, we have grave doubts about the findings of liability in this case. First, with respect to the plaintiff-appellees who were convicted inmates, the District Court expressed uncertainty as to whether the overcrowded conditions at the Jail were unconstitutional. After finding that the overcrowding at the D.C. Jail had created an environment ripe for a violent explosion—a factual predicate that could support, under recent case law, a conclusion that prison conditions violated the Constitution—the District Court wrote that "it is not clear whether ... the facility was sufficiently overcrowded to violate the constitutional rights of permanent prisoners." *See Marsh,* 705 F.Supp. at 19 n. 22. The trial court found this uncertainty untroubling, however, because, in its view, "damages ... may be awarded whether or not the overcrowding is unconstitutional as long as the inmates are legitimately but nevertheless subjectively frustrated by the crowded conditions." *See id.* at 19. But such a view finds no support in the law. If the overcrowding—to which the plaintiffs attributed all of their woes—did not violate the prisoners' federally secured rights, then the essential predicate for section 1983 liability is absent.

■ Second, with respect to the plaintiffs who were pretrial detainees, the District Court *did* find the overcrowding unconstitutional, but it rested this conclusion upon a 1975 judicial opinion dealing with conditions at the old jail. *See id.* at 19 n. 22 (citing *Campbell v. McGruder,* 416 F.Supp. 100 (D.D.C.1975), *aff'd in part,* 580 F.2d 521 (D.C.Cir.1978)). By the time of the July 1983 riot, however, that jail had been razed and replaced by the larger and more modern Central Detention Facility at issue in this case. Thus, that earlier opinion cannot be viewed as dispositive of the question of the constitutionality of the conditions of confinement faced eight years later by pretrial detainees at the new Jail.

These concerns give us pause in considering the District Court's conclusions on liability. *See Inmates of Occoquan v. Barry,* 844 F.2d 828, 836–37 (D.C.Cir.1988) (claims of unconstitutional prison conditions must be approached with circumspection and proven with specificity). We need not pause long over our misgivings, however, because we conclude that liability is foreclosed in any event by the defendants' qualified immunity. In short, although we acknowledge that the defendants' conduct, considered in view of recent case law, arguably could be found to be a violation of the plaintiffs' constitutional rights, we hold that the contours of the applicable constitutional law were not sufficiently defined in 1983 such that the defendants should have

---

441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979). A condition may amount to punishment if it "is not reasonably related to a legitimate [institutional] goal—if it is arbitrary or purposeless." *Id.* at 539, 99 S.Ct. at 1874. For convicted prisoners, the question is not whether prison conditions amount to punishment—for convicts plainly may be punished—but rather whether the conditions "deprive inmates of the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). "Such conditions could be cruel and unusual under the contemporary standard of decency...." *Id.*

**5.** No question of personal liability was presented in *Morgan.*

understood *then* that their actions infringed the plaintiffs' constitutional rights.

## B. *Qualified Immunity*

■ The three defendant-officials in this case were plainly protected by qualified immunity in the performance of their discretionary functions related to prison administration. *See Procunier v. Navarette*, 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978) (state prison officials enjoy qualified immunity in § 1983 actions). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (citations omitted). Moreover, "the right the official is alleged to have violated must have been 'clearly established' in a ... particularized ... sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640, 107 S.Ct. at 3039. The question thus presented is clear: Were the constitutional requirements concerning prison conditions sufficiently clear in mid–1983 that the defendant-officials reasonably must have known that they were violating the plaintiffs' constitutional rights by virtue of the mounting overcrowding at the D.C. Jail?

■ As an initial matter, we must first consider the significance of the fact that, at the time of the 1983 riot, the defendants were subject to a court order in *Campbell* defining certain entitlements of the pretrial detainees. The existence of this court order might appear at first blush to dispose of the qualified immunity question, at least with respect to the pretrial detainees: at the time of the officials' conduct, they were under judicial mandate to take certain measures to safeguard the rights of pretrial

detainees; the existence of the court order "clearly established" the detainees' rights and, because the officials were later found to be in contempt of that order, the defendants could be said to have violated those "clearly established" rights. *See Jackson v. Hollowell*, 714 F.2d 1372, 1376 (5th Cir. 1983) (inmates' rights were "clearly established" by earlier court order, such that breach of that order could not be within officials' qualified immunity).

As attractively direct as this approach might be, we cannot adopt it. First, the scope of the entitlements that could be said to have been "clearly established" by the court order in *Campbell* were relatively narrow. They concerned the precise conditions under which prison officials could engage in the practice of "double-celling" pretrial detainees. Second, and most importantly, it is not clear whether the officials were actually in violation of the court order at the time of the riot and fire. The decision finding the defendants in contempt of the District Court's 1982 order documents violations only until July 19, 1983. For the period following that date, the court did not resolve whether all alleged constitutional deficiencies had been cured, as the defendants claimed, or whether the conditions continued to violate the express standards of the order. *See Campbell v. McGruder*, Civ.Action No. 1462–71, mem. op. at 14, 25 & n. 7 (D.D.C. Sept. 30, 1983) (noting that defendants insisted all "double-celling" of pretrial detainees at the Jail ceased on July 19, 1983, although "the accuracy of this representation is uncertain"). Because the riot at issue in this case occurred on July 22, 1983, the contempt order cannot be relied upon to establish the defendants' violation of the detainees' "clearly established" constitutional rights at the time of their injury.[6]

Thus, as noted at the outset, the principal question in this case concerns the clarity of the case law as it existed in mid–1983 with respect to the constitutional entitlements of both the pretrial detainees and

---

**6.** While not dispositive, it is noteworthy that the orders and contempt citation in *Campbell* were issued against the defendants in their official capacities; this did not afford a basis for imposing individual liability. *See, e.g., Headley v. Bacon*, 828 F.2d 1272, 1279 (8th Cir.1987).

the convicted prisoners. We recognize that there were indications by 1983 that the Eighth and Fifth Amendments protected convicted inmates and pretrial detainees against egregious prison overcrowding and against foreseeable and reasonably preventable acts of violence by fellow inmates.[7] At the same time, however, the Supreme Court had only begun to direct its attention to these questions and, as of mid–1983, the "contours" of the constitutional protections remained sketchy. *See generally, Inmates of Occoquan,* 844 F.2d at 835–39 (reviewing development of Supreme Court precedent on scope of Eighth Amendment restrictions on prison conditions). Our review of this case law suggests that the defendants were operating in largely uncharted territory, in which very general rules had been articulated but in which fact-specific applications of those rules were few.

■ With regard to pretrial detainees, the Supreme Court's sole pronouncement came in 1979, in a case in which it held that the conditions of pretrial confinement at a New York City jail did not amount to punishment and were therefore constitutional. *See Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). *Bell* made clear that prison officials are entitled to impose upon a detainee whatever restrictions or disabilities are reasonably necessary to ensure the internal security of the institution and to effect his eventual presence at trial; restrictions or conditions that are intended as punishment, however, or that are not "reasonably related to a legitimate governmental objective" violate due process. *See id.* at 536–40, 99 S.Ct. at

1872–75. The Court went on in *Bell* to reject the claim, on the particular facts before it, that overcrowding and "double-bunking" of pretrial detainees in cells designed to house only one person violated the Constitution:

> While confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment, nothing even approaching such hardship is shown by this record.

*Id.* at 542, 99 S.Ct. at 1875–76 (footnote omitted). Beyond this, however, *Bell* did not purport to define the precise conditions under which overcrowding would violate the constitutional rights of pretrial detainees.

The only other guidance given by the Court before 1983 with respect to the rights of pretrial confinement came by implication in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). In *Youngberg,* the Court considered a due process challenge to the conditions under which Pennsylvania confined the profoundly retarded in state institutions. The Court held that due process required the state to provide for the basic material needs of its wards, as well as "reasonable safety for all residents and personnel within the institution." *See id.* at 324, 102 S.Ct. at 2462. *Youngberg,* although not addressed expressly to the issue of prison conditions, nonetheless reasonably suggested a constitutional entitlement of pretrial detainees to a "reasonably safe" prison environment.[8]

7. *See, e.g., Doe v. District of Columbia,* 701 F.2d 948, 961–62 (D.C.Cir.1983) (separate statement of Edwards, J.) ("Prison officials have a corresponding *duty* 'to exercise reasonable care to prevent prisoners from intentionally inflicting harm or creating unreasonable risks of harm to other prisoners.'") (emphasis in original; quoting *Withers v. Levine,* 615 F.2d 158, 161 (4th Cir.), *cert. denied,* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980)); *Wade v. Haynes,* 663 F.2d 778, 781–82 (8th Cir.1981) (Eighth Amendment violated where conduct of prison guard represents an "egregious failure" to protect inmate from foreseeable attack), *aff'd sub nom. Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d

632 (1983); *Murphy v. United States,* 653 F.2d 637, 644–45 (D.C.Cir.1981) (Eighth Amendment violated where prison officials show "deliberate indifference" to pervasive risk of violence to inmates); *Woodhous v. Virginia,* 487 F.2d 889, 890 (4th Cir.1973) ("A prisoner has a right, secured by the eighth and fourteenth amendments, to be reasonably protected from constant threat of violence and sexual assault by his fellow inmates....").

8. In the years since 1983, the Supreme Court has provided further guidance about the scope of the due process rights of pretrial detainees. *See United States v. Salerno,* 481 U.S. 739, 746–

The Supreme Court's guidance concerning the Eighth Amendment's protections for convicted inmates was scarcely more definitive by 1983. In 1976, the Supreme Court held that "deliberate indifference" by prison officials to the medical needs of sick or injured inmates could amount to cruel and unusual punishment where it results in "unnecessary and wanton infliction of pain." *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Two years later, in *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), the Court was presented with a case in which all parties conceded that flagrantly brutal conditions at two Arkansas prisons constituted cruel and unusual punishment. *See id.* at 685, 98 S.Ct. at 2570–71. It was not until 1981, however, that the Supreme Court "consider[ed] ... for the first time the limitation that the Eighth Amendment ... imposes upon the conditions in which a State may confine those convicted of crimes." *Rhodes v. Chapman,* 452 U.S. 337, 344–45, 101 S.Ct. 2392, 2398, 69 L.Ed.2d 59 (1981). In *Rhodes,* the Court provided some additional definition to the scope of the constitutional right in the course of rejecting a claim that "double-celling" and overcrowding generally in an Ohio prison violated the Eighth Amendment. Prison "[c]onditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment," the Court wrote. *Id.* at 347, 101 S.Ct. at 2399. Moreover, prison conditions may violate the Eighth Amendment if they "deprive inmates of the minimal civilized measure of life's necessities" such as to offend "the contemporary standard of decency." *See id.* Notwithstanding these general rules, however, the Court held that the prison overcrowding described in the case before it, in which convicted prisoners were paired on a long-term basis in cells designed for single occupancy, fell "far short" of making out a constitutional violation. *See id.* at 348.[9]

■ From these pronouncements it could reasonably be surmised that prison overcrowding, if sufficiently egregious, could violate prisoners' Eighth Amendment rights and, even more readily, pretrial detainees' Fifth Amendment rights. A reading of these cases also would have suggested, however, that conditions must be rather stark before the Court would overcome its oft-stated reluctance to second-guess correctional officials in the administration of prisons. *See Inmates of Occoquan,* 844 F.2d at 835–40; *see also Bell,* 441 U.S. at 547, 554, 99 S.Ct. at 1878, 1882. Given the Supreme Court's rejection of constitutional claims grounded in overcrowding in both *Bell* and *Rhodes,* we cannot agree that the constitutional rights asserted in this case were "clearly established" *in 1983, i.e.,* in the fact-specific sense required by *Anderson.* In other words, for purposes of assessing the claim of qualified immunity, we find that "[t]he contours of the [constitutional] right" were simply not "sufficiently clear" in 1983 "that a reasonable official would [have] underst[oo]d that what he ... [was] doing violate[d] that right." *See Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039.

We do not mean in any way to minimize the hardships and trauma suffered by the plaintiffs as a result of the July 1983 prison riot. Nor do we mean to endorse conduct by the defendants that, in the most flattering light, appeared to constitute foot-dragging and sluggishness in the face of a serious administrative challenge and that, in the harsher light of hindsight, may well have constituted a violation of the inmates' constitutional rights. At the same time, however, we are required to recognize that the constitutional landscape upon which the defendants maneuvered was only dimly illuminated. Because the state of the law was then unsettled, we must conclude that the defendant-officials acted within the

47, 107 S.Ct. 2095, 2101–02, 95 L.Ed.2d 697 (1987); *Block v. Rutherford,* 468 U.S. 576, 584, 104 S.Ct. 3227, 3231–32, 82 L.Ed.2d 438 (1984).

9. For a post–1983 case explicating the Eighth Amendment's reach into prison administration, see *Whitley v. Albers,* 475 U.S. 312, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

scope of their qualified immunity in the events leading up to the riot and fire.

### III. CONCLUSION

For the foregoing reasons, the judgment of the District Court is reversed.

*So ordered.*